B. John Casey, OSB No. 120025
john.casey@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Andrew L. Deutsch, CSB No. 319286
andrew.deutsch@dlapiper.com
*Admitted pro hac vice*
DLA PIPER LLP
2000 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 595-3000
Facsimile: (310) 595-3030

Francis W. Ryan, NYB No. 2684058
frank.ryan@dlapiper.com
*Admitted pro hac vice*
Kerry A. O'Neill, NYB No. 5143995
kerry.oneill@dlapiper.com
*Admitted pro hac vice*
DLA PIPER LLP
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 335-4850
Facsimile: (212) 335-4501

Attorneys for Defendant NIKE, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| QUEST SOFTWARE, INC., a Delaware corporation,<br><br>        Plaintiff/<br>        Counterclaim Defendant,<br><br>  v.<br><br>NIKE, INC., an Oregon corporation,<br><br>        Defendant/<br>        Counterclaim Plaintiff. | Case No.: 3:18-CV-00721-BR<br><br>**DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL** |

PAGE 1 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

Defendant and Counterclaimant NIKE, Inc. ("NIKE"), by its undersigned counsel, hereby answers the Complaint ("Complaint") filed by Plaintiff and Counterdefendant Quest Software, Inc. ("Quest"), and asserts its Counterclaims as follows:

## GENERAL DENIAL

Unless specifically admitted below, NIKE denies each and every allegation in the Complaint.

## NATURE OF THE ACTION

**Answer to Complaint Paragraph No. 1:**

NIKE admits that Quest purports to assert claims for breach of software license agreements, copyright infringement, and violation of the Digital Millennium Copyright Act against NIKE, but denies any liability thereunder.

## THE PARTIES

**Answer to Complaint Paragraph No. 2:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations of paragraph 2 of the Complaint, and, on that basis, denies them.

**Answer to Complaint Paragraph No. 3:**

NIKE admits the allegations contained in paragraph 3 of the Complaint.

## JURISDICTION AND VENUE

**Answer to Complaint Paragraph No. 4:**

NIKE admits that this Court has subject matter jurisdiction over disputes arising under the copyright laws of the United States.  NIKE admits that Quest purports to assert copyright infringement and DMCA claims against NIKE, but denies any liability thereunder.  NIKE lacks sufficient knowledge or information to admit or deny the remaining allegations of paragraph 4 of the Complaint and, on that basis, denies them.

PAGE 2 -  **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

**Answer to Complaint Paragraph No. 5:**

NIKE admits that Quest asserts that the Court has pendent jurisdiction over the state law breach of contract claim that Quest purports to assert, but avers that the Court should decline to exercise supplemental jurisdiction over that claim pursuant to 28 U.S.C. § 1367(c).

**Answer to Complaint Paragraph No. 6:**

NIKE admits that venue is proper in this Court with respect to this action.

## FACTS

**Answer to Complaint Paragraph No. 7:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 7 of the Complaint, and, on that basis, denies them.

**Answer to Complaint Paragraph No. 8:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 8 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 9:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 9 of the Complaint, and, on that basis, denies them.

**Answer to Complaint Paragraph No. 10:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 10 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 11:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 11 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 12:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 12 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 13:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 13 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 14:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 14 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 15:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 15 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 16:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 16 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 17:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 17 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 18:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 18 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 19:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 19 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 20:**

NIKE lacks sufficient knowledge or information to form a belief about the truth of the allegations contained in paragraph 20 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 21:**

NIKE admits that on or about November 1, 2001, NIKE and Quest entered into a Software License and Service Agreement ("SLSA").  NIKE denies the remaining allegations contained in paragraph 21 of the Complaint.

**Answer to Complaint Paragraph No. 22:**

NIKE admits that upon and subsequent to its entry into the SLSA, NIKE obtained from Quest the right to use the Quest "Licensed Software," as defined in Section 1.10 of the SLSA, and, from time to time, the right to use additional Quest "Software Products," as defined in Section 1.19 of the SLSA, and to have additional use of the Quest "Licensed Software" and of additional Quest "Software Products," and that NIKE made payment for such rights to Quest as provided in the SLSA.  NIKE denies the remaining allegations contained in paragraph 22 of the Complaint.

PAGE 5 -   **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

**Answer to Complaint Paragraph No. 23:**

NIKE admits that Paragraph 12 of the SLSA provides, in relevant part, that "Quest shall have the right to perform, or cause an independent accounting firm to perform, at Quest's sole expense, an audit to verify that Licensee is using the Licensed Software in compliance with this Agreement." NIKE denies the remaining allegations contained in Paragraph 23 of the Complaint.

**Answer to Complaint Paragraph No. 24:**

NIKE admits that, in or about January 2017, Deloitte LLP, which, upon information and belief was retained by Quest, conducted an audit of NIKE's use of Quest software products, purportedly pursuant to the SLSA. NIKE denies the remaining allegations contained in paragraph 24 of the Complaint.

**Answer to Complaint Paragraph No. 25:**

NIKE admits that Quest thereafter presented NIKE with a spreadsheet that Quest purported to be the results of said audit, and that, after reviewing the spreadsheet, NIKE contested the spreadsheet because it did not calculate overdeployment of Quest Software as required by the SLSA. NIKE denies the remaining allegations contained in paragraph 25 of the Complaint.

**Answer to Complaint Paragraph No. 26:**

NIKE admits that Quest asserted that "pirated keys" were used to access certain Quest software products. NIKE denies the remaining allegations contained in paragraph 26 of the Complaint.

**Answer to Complaint Paragraph No. 27:**

NIKE denies the allegations contained in paragraph 27 of the Complaint.

PAGE 6 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

**Answer to Complaint Paragraph No. 28:**

NIKE denies the allegations contained in paragraph 28 of the Complaint.

**Answer to Complaint Paragraph No. 29:**

NIKE admits that there have been further discussions between NIKE and Quest since Quest delivered the above-referenced purported audit report, during which (1) NIKE explained to Quest that calculations of additional use of Quest software contained in Quest's audit report failed to comply with the terms of Section 12 of the SLSA, and NIKE offered to pay to Quest the amount that would be due to Quest for unauthorized use of Quest software under Section 12 of the SLSA, but (2) Quest refused such offer and instead demanded that NIKE pay Quest amounts far in excess of any amount that NIKE might reasonably owe under Section 12 of the SLSA. NIKE denies the remaining allegations contained in paragraph 29 of the Complaint.

**Answer to Complaint Paragraph No. 30:**

NIKE denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 30 of the Complaint regarding Quest's "understanding" or its "ongoing inquiry."  NIKE denies the remaining allegations contained in paragraph 30 of the Complaint.

**FIRST CLAIM FOR RELIEF**
**BREACH OF CONTRACT**

**Answer to Complaint Paragraph No. 31:**

NIKE incorporates by reference its admissions, denials and averments contained in the preceding paragraphs of this Answer as though set forth in their entirety.

**Answer to Complaint Paragraph No. 32:**

NIKE admits that it licensed Quest software products under and pursuant to the terms of the SLSA, which is a valid, enforceable two-party contract.

PAGE 7 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

.

**Answer to Complaint Paragraph No. 33**:

NIKE admits that it agreed to use Quest software products, and pay for such use, pursuant to the terms of the SLSA.  NIKE denies the remaining allegations contained in paragraph 33 of the Complaint.

**Answer to Complaint Paragraph No. 34**:

NIKE denies the allegations contained in paragraph 34 of the Complaint.

**Answer to Complaint Paragraph No. 35**:

NIKE denies the allegations contained in paragraph 35 of the Complaint.

**SECOND CAUSE OF ACTION**
**COPYRIGHT INFRINGEMENT**

**Answer to Complaint Paragraph No. 36**:

NIKE incorporates by reference its admissions, denials and averments contained in the preceding paragraphs of this Answer as though set forth in their entirety.

**Answer to Complaint Paragraph No. 37**:

NIKE denies the allegations contained in paragraph 37 of the Complaint.

**Answer to Complaint Paragraph No. 38**:

NIKE denies the allegations contained in paragraph 38 of the Complaint.

**Answer to Complaint Paragraph No. 39**:

NIKE denies the allegations contained in paragraph 39 of the Complaint.

**Answer to Complaint Paragraph No. 40**:

NIKE denies the allegations contained in paragraph 40 of the Complaint.

**Answer to Complaint Paragraph No. 41**:

NIKE denies the allegations contained in paragraph 41 of the Complaint.

PAGE 8 -  **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

## THIRD CAUSE OF ACTION
## VIOLATION OF DIGITAL MILLENNIUM COPYRIGHT ACT

**Answer to Complaint Paragraph No. 42:**

NIKE incorporates by reference its admissions, denials and averments contained in the preceding paragraphs of this Answer as though set forth in their entirety.

**Answer to Complaint Paragraph No. 43:**

Paragraph 43 of the Complaint constitutes a legal conclusion to which no response is required.

**Answer to Complaint Paragraph No. 44:**

NIKE lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 44 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 45:**

NIKE lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 45 of the Complaint and, on that basis, denies them.

**Answer to Complaint Paragraph No. 46:**

NIKE denies the allegations contained in paragraph 46 of the Complaint.

**Answer to Complaint Paragraph No. 47:**

NIKE denies the allegations contained in paragraph 47 of the Complaint.

## RELIEF

NIKE denies that Quest is entitled to any of the relief requested by Quest or that Quest is entitled to any relief at all, and prays that the Court dismiss Quest's complaint in its entirety.

\* \* \*

PAGE 9 -  **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

96948958.3 0063718-00259

## AFFIRMATIVE DEFENSES

NIKE's Affirmative Defenses are listed below. The designation of any defense as an "Affirmative Defense" does not concede that NIKE bears the burden of proof with respect to that defense. NIKE reserves the right to amend its answer to add affirmative defenses consistent with facts discovered in the case.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

1.       Quest fails to state a claim against NIKE upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Lack of Standing)

2.       The claims asserted in the Complaint are barred, in whole or part, because Quest lacks standing to assert claims for each claimed copyright.

## THIRD AFFIRMATIVE DEFENSE

### (Non-Infringement)

3.       Quest's claims are barred, in whole or in part, because NIKE has not infringed valid registered copyrights owned by Quest.

## FOURTH AFFIRMATIVE DEFENSE

### (Estoppel)

4.       By Quest's own actions and/or assertions, Quest is legally and/or equitably estopped from asserting the claims, rights, and demands alleged against NIKE.

## FIFTH AFFIRMATIVE DEFENSE

### (Election of Exclusive Contractual Remedy)

5.      Quest's Second and Third Causes of Action are barred because by executing the SLSA, Quest elected that its sole and exclusive remedy for any claim against NIKE for unauthorized use of or access to Quest software products, including but not limited to use or access obtained through keys or other access devices not provided by Quest, would be the contractual remedy, provided in Section 12 of the SLSA, of payment of "the amount of the negotiated fee applicable to the particular Software Product or Product to which unauthorized access was permitted, for all such unauthorized users."

## SIXTH AFFIRMATIVE DEFENSE

### (Tender of Payment)

6.       Quest's claims against NIKE are barred because NIKE has tendered payment to Quest of all amounts due to Quest for unauthorized use of or access to Quest software products, pursuant to Section 12 of the SLSA.

## SEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

7.      Quest has failed, refused, and/or neglected to take reasonable steps to mitigate Quest's alleged damages, if any, thus barring or diminishing any recovery by Quest.

## EIGHTH AFFIRMATIVE DEFENSE

### (Fault of Others)

8.      Any loss, injury, damage, or detriment actually suffered or sustained by Quest was directly and proximately caused and contributed to by the breach, conduct, acts, omissions, activities, carelessness, recklessness, negligence, fraudulent, and/or intentional misconduct or

actions of persons or entities other than NIKE, for which NIKE is not directly or secondarily responsible.

## NINTH AFFIRMATIVE DEFENSE

### (Extraterritorial Conduct)

9.      Some or all of the copyright infringements and/or violations of the DMCA alleged in the Second and Third Causes of Action occurred outside of the United States and, in consequence, the Court either lacks subject matter jurisdiction over such claims or the claims fail to state a cause of action under the Copyright Act.

## TENTH AFFIRMATIVE DEFENSE

### (Copyright Misuse)

10.      Quest's Second and Third Causes of Action are barred or unenforceable as Quest's conduct, including its predatory audit practices, constitutes copyright misuse.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Lack of Valid Registrations)

11.      Quest's claims are barred to the extent Quest lacks valid registrations of copyrights alleged in the Complaint.

## TWELFTH AFFIRMATIVE DEFENSE

### (License)

12.      Quest's claims are barred, in whole or in part, because Quest expressly or impliedly licensed NIKE to make the uses of the Quest software products alleged in the Complaint, subject only to payment as required by the SLSA, and NIKE has either made or tendered all payments due to Quest under the SLSA for such uses.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Unclean Hands and Bad Faith)

13.     Quest's claims against NIKE are based on bad faith and are barred by the doctrine of unclean hands.  Quest's own conduct of granting licenses to NIKE for the software products at issue, and failing to perform in accordance with the terms of the SLSA, have caused NIKE to incur additional expenses and further liability to its detriment.  Quest's claims are barred based on its bad faith and wrongful conduct.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Lack of Actual Damages)

14.     NIKE is not liable for any alleged actual damages because Quest has not suffered any actual damages attributable to the conduct alleged in the Complaint.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

15.     Some or all of the causes of action alleged in the Complaint are barred by the applicable statute of limitations.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Failure to Comply with 17 U.S.C. § 412)

16.     Quest's demand to recover statutory damages and attorney's fees for its claim for copyright infringement are barred because some or all of Quest's alleged copyright registrations for its alleged copyrightable works were not made within three months after first publication thereof, and NIKE'S alleged infringements commenced after first publication of said works and before the effective dates of said registrations.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Reservation of Additional Defenses)

17.     NIKE reserves the right to assert additional affirmative and other defenses, at law or in equity, that NIKE may learn it possesses as a result of discovery or any other factual investigation concerning this case or any related action.

\* \* \*

## NIKE, INC.'S COUNTERCLAIMS

1.     Defendant and Counterclaimant NIKE, Inc. ("NIKE"), for its counterclaims against Plaintiff and Counterdefendant Quest Software, Inc. ("Quest"), alleges as follows:

2.     NIKE is a corporation duly organized and existing under the laws of the State of Oregon, having its principal place of business at One Bowerman Drive, Beaverton, OR 97005-6453.

3.     Quest alleges in its Complaint that it is a Delaware corporation with its principal place of business in Aliso Viejo, California.

## JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, 1367, 2201, and 2202, as the Counterclaims are so related to the claims in the original action that they form part of the same case or controversy under Article III of the United States Constitution, and arise out of the same nucleus of facts, transactions, or occurrences that are alleged in the Complaint.

5.     This Court has personal jurisdiction over Quest.

6.     Venue in this district is permissible under 28 U.S.C. §§ 1391(b)-(c) and 1400(b), and because Quest filed its Complaint in this district.

7.      By virtue of the controversies described below, an actual and justiciable controversy has arisen between NIKE on the one hand, and Quest on the other, with respect to the rights and remedies under the parties' Master Software License and Service Agreement ("SLSA").

## FACTUAL ALLEGATIONS

**A.      NIKE's Use of Quest Software Programs**

8.      The software NIKE licenses from Quest provides tools that are used in the administration and management of databases across NIKE's business.  Those databases include sales and inventory data, as well as consumer and order information.  The Quest software is used to manage and access these databases by NIKE's team of database administrators and by software developers, applications engineers, and data analysts.

**B.      The Master Software License and Service Agreement between NIKE and Quest**

9.      On or about November 1, 2001, Quest and NIKE entered into the SLSA.  A true and correct copy of the SLSA is attached hereto as Exhibit A.  Under the SLSA, Quest granted to NIKE a non-exclusive, perpetual, global license to, among other things, install, use, access, run, integrate, implement, test, and operate a series of software products which Quest claimed to have developed and exclusively own ("Quest Software"), and to have the right to license use of Quest Software to others.

10.      Following the execution of the SLSA, over the years, NIKE has continued to purchase software licenses and maintenance/support from Quest, both directly and through authorized Quest resellers.

11.      The SLSA does not restrict NIKE's ability to download and use evaluation, trialware, or freeware versions of Quest Software, whether in production or non-production environments.

PAGE 15 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

12.     The SLSA does not restrict NIKE from using license keys or other license access devices not obtained from Quest to access and use Quest Software.

13.     In contrast to the SLSA, some software license agreements entered between Quest and other Quest licensees after the effective date of the SLSA do expressly limit the licensee's right to download and use evaluation, trialware and freeware versions of Quest.  For example, Quest is party to a 2012 "Master Product Agreement" with World Fuel Services Corporation, a Miami business.  A copy of that agreement was filed as Exhibit A to the complaint filed by Quest against World Fuel Services Corporation in *Quest Software Corp. v. World Fuel Services Corp.*, No. 17-cv-05989 (W.D. Wash, filed November 18, 2017), and is alleged by Quest in paragraph 25 of that complaint to be a "true and correct" copy of the agreement.  A copy of that "Master Product Agreement" is attached hereto as Exhibit B.

14.     Unlike the SLSA, which contains no restrictions on NIKE's ability to download and use Quest Software for evaluation purposes, or its ability to download and use freeware and trialware versions of Quest Software, Section 3(c) of the "Master Product Agreement" provides that if software is obtained from Quest for evaluation purposes, the customer is granted only a "non-production License" under which the software may be used "solely for Customer's own evaluation purposes for an evaluation period of up to thirty (30) days from date of delivery of the Software, plus any extensions granted by Quest in writing[.]"  Section 3(e) of the "Master Product Agreement" provides that "[i]f a freeware version of Quest software ("Freeware") is downloaded by Customer from a Quest website, the terms of such use shall be governed by the applicable Freeware definition set forth in the Product Guide."

15.     Unlike the SLSA, which does not restrict NIKE from using license keys or other license access devices not provided by Quest to install or access Quest Software, Section 4 of the

PAGE 16 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

"Master Product Agreement" Quest entered into with World Fuel Services Corporation provides that "Customer may not use any license keys or other license access devices not provided by Quest, including but not limited to 'pirated keys,' to install or access the products."

C.    **"Users" of Quest Software Under the SLSA Must Actually Use the Software**

16.    Under the SLSA and orders issued thereunder by NIKE, NIKE and Quest have consistently agreed that NIKE will only pay for licenses on the basis of NIKE employees or persons authorized by NIKE who actually use the Quest Software.

17.    Quest Software, like all operational software, contains executable files.  When these files are accessed and executed, the relevant program(s) will run and perform the tasks for which the program(s) are designed and for which NIKE has licensed that software.  "Use" of a Quest software program means to run that program and a person who directs the program to run is a "user."

18.    The Microsoft Windows operating system, on which Quest Software was installed, creates logs that can be used to identify each occasion on which a Quest Software program was executed, that is, used, on that particular system.  Using these logs in correlation with other forensic artefacts on the system permits identification of the users of Quest Software.

19.    NIKE has not agreed, under the SLSA or otherwise, to pay for licenses for Quest Software for persons or systems who could theoretically access the Quest Software, but who do not actually use the software.  One important reason for this is that although many people and machines within the NIKE system are authorized to access servers on which a copy of a Quest Software program is stored, they have no need to run any Quest Software program and do not use that software.  For example, NIKE's cyber security and forensics professionals must have access to every server within NIKE's IT infrastructure – including those on which Quest software is

PAGE 17 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

installed – in order to maintain the security of NIKE's network.  Similarly, IT systems

administrators may need to access a server on which a copy of Quest software, among other files,

is stored to perform maintenance on the server or to troubleshoot.  Automated machine systems

may access the same server to inventory the software programs loaded on the server.  Although in

theory such persons or machines could direct execution of a Quest Software program stored on that

server, they do not do so.

> **D.      The SLSA's Audit Provision**

20.      NIKE has no record of any prior Quest audit of NIKE's use of the Quest Software

since at least as far back as 2003.

21.      Software licensor-licensee master agreements commonly recognize that given the

needs of a licensee's business, that licensee may need to allow additional authorized users to make

use of the software after the master license agreement is executed, but before additional user

licenses can be purchased from the licensor for those users.  They also recognize that business

licensees with large footprints may not be able to track all authorized users of the software with

complete accuracy.  Given these facts, and to avoid unnecessary litigation and strain on licensor-

licensee relationships, licensors and licensees frequently include an audit/payment term in their

master software agreements to address the situation.

22.      Such an audit/payment term typically specifies that (a) the licensor or its designee

may periodically audit the licensee's users of the software to determine whether the licensee has

paid for all the licenses needed to authorize the users to use the software, and (b) if the agreed-

upon results of the audit indicate that not all of the needed licenses have been paid for, the licensee

will compensate the licensor for the licensee's additional users (often called "overdeployment") on

the basis of a calculation method specified in the contract.  The licensor's sole and exclusive

PAGE 18 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND
COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT
AND DEMAND FOR JURY TRIAL**

remedy for overdeployment is payment by the licensee for licenses for additional users, in accordance with such a contractual compensation provision.

23.     Such a provision was agreed to between NIKE and Quest and incorporated in the SLSA as Section 12.

24.     Section 12 of the SLSA provides, in relevant part:

> Quest shall have the right to perform, or cause an independent accounting firm to perform, at Quest's sole expense, an audit to verify that Licensee is using the Licensed Software in compliance with this Agreement […].  Any such audit shall be conducted upon prior notice of not less than thirty (30) days to a) the person designated in the applicable Software Order; and b) the Licensee IT Department; and c) the Licensee Legal Department.  […]  **In the event that an audit conducted as set forth herein discloses that Licensee has caused or permitted access to or use of the System by persons or entities that are not authorized under the terms of this Agreement to such use or access, Licensee shall pay Quest the underpayment, in the amount of the negotiated fee applicable to the particular Software Product or Product to which unauthorized access was permitted, for all such unauthorized users.  Provided that Licensee pays the underpayment as described above, Licensee shall not be deemed to be in breach of this Agreement or of any licensing rights granted hereunder.**  Audits shall be initiated no more often than once every eighteen months and each audit shall be completed within forty-five (45) days of Licensee's receipt of notice." (Emphasis added.)

25.     Under Section 12 of the SLSA, in the event of an audit, NIKE is only required to pay "Quest the underpayment, in the amount of the negotiated fee applicable to the particular Software Product or Product to which unauthorized access was permitted, **for all such unauthorized users**." (Emphasis added).  Thus, under this plain and unambiguous language, any amount to be paid by NIKE to Quest following an audit is to be calculated on the basis of the number of "unauthorized users" of the relevant software program.  The ordinary meaning of

"users," as explained above, is persons or machines who actually have caused a Quest Software program to be executed so as to perform its intended function.

### E.    Quest's Audit of NIKE

26.    Between the execution of the SLSA and January 4, 2017, Quest did not seek to audit NIKE's use of Quest Software under Section 12 of the SLSA.

27.    On or about January 4, 2017, Quest informed NIKE that it was undertaking an audit of NIKE's use of Quest Software in accordance with Section 12 of the SLSA (the "Audit Notice").  A copy of the Audit Notice is attached as Exhibit C.

28.    Per the Audit Notice, Quest appointed Deloitte LLP ("Deloitte") as the entity to conduct the audit of NIKE.

29.    The Audit Notice provides that "[t]his review activity should not in any way inhibit sales negotiations between Quest and Nike that are in progress for license acquisition **or support renewal**." (Emphasis added.)

30.    NIKE fully cooperated with Deloitte and Quest during the conduct of the audit. Such cooperation included providing Deloitte with access to NIKE's systems and databases and responding to requests for information from Deloitte and Quest.

31.    Deloitte and Quest provided NIKE with "scripts" that were purportedly intended to examine the use of Quest Software on NIKE servers in order to determine whether there had been any "unauthorized users" of that Quest Software and inventory any "unauthorized users," so that Quest could determine the amount of license fees due to Quest under Section 12 of the SLSA, if any.  NIKE permitted Deloitte and Quest to run these scripts on NIKE's systems and databases and to receive the corresponding inventories of users.

32.     On or about June 6, 2017, Quest provided NIKE with a spreadsheet, labeled "Reconciliation Summary."  Quest represented in an accompanying e-mail that this spreadsheet "compares the data Nike provided to Deloitte during the audit and the number of licenses owned by Nike."  The spreadsheet did not contain pricing of the licenses that Quest claimed NIKE was required to purchase.

33.     Upon receipt and review of Quest's "Reconciliation Summary," NIKE realized that the "scripts" provided by Deloitte and Quest were not designed to inventory users of Quest Software on NIKE systems – that is, persons who had actually run a Quest Software program. Instead, they were intentionally designed to inventory all persons or machines which had the right to access servers on which Quest Software programs were stored, without regard to whether such persons or machines ever actually used a Quest Software program.

34.     Upon information and belief, Quest intentionally designed its audit "scripts" for NIKE for the bad faith purposes of creating an improper estimation of overdeployment, in order to support an inflated demand for payment, contrary to the requirements of Section 12 of the SLSA.

35.     After reviewing the Quest "Reconciliation Summary," NIKE performed its own inventory of its systems and determined the number of users who had actually run a Quest Software program but for whom a license had not been purchased, which is the determination required by Section 12 of the SLSA.  Thereafter, on or about August 4, 2017, NIKE provided a preliminary report to Quest, showing the discrepancies between the license count contained in the Quest "Reconciliation Summary" and the overdeployment numbers calculated by NIKE in accordance with Section 12 of the SLSA.

36.     NIKE notified Quest that Quest was only entitled to payment for overdeployment to actual <u>users</u> of Quest software, not persons who in theory could have accessed Quest software but for whom there was no evidence of actual use of that software.

37.     Quest ignored NIKE's notification of the serious errors in Quest's calculation of overdeployment.  Instead, on or about August 21, 2017,  Quest provided NIKE with a revised version of Quest's "Reconciliation Summary" which used the same calculations of overdeployment as in the prior version, and added columns asserting that based on Quest software pricing, NIKE owed Quest $15,646,191.55 for overdeployment.  In an accompanying e-mail, Quest asserted that this amount included four years of interest calculated on the Oregon prejudgment interest rate of 9%, charges for licenses for access to freeware and trialware versions of Quest software, one year of maintenance, and a multiplier of three times applied to alleged use by NIKE of "pirated software."  Quest also asserted, contrary to the express language of Section 12 of the SLSA, that NIKE was required to pay for all persons whom NIKE caused or permitted to have access to Quest Software, regardless of whether those persons were "unauthorized users" as defined by Section 12 of the SLSA.

38.     In subsequent communications to Quest and its counsel, NIKE objected to Quest's calculation of amounts due under Section 12 of the SLSA because Quest's calculations ignored the SLSA's requirement that overdeployment be calculated on the basis of "unauthorized users"; because the SLSA did not require NIKE to pay interest charges on amounts due under the SLSA for overdeployment; because the SLSA did not require NIKE to pay Quest for use of freeware and trialware versions of Quest Software or limit the environment in which such versions could be used; and because the SLSA did not require NIKE to pay any multiplier for use of license keys or other license access devices not provided by Quest to access and use Quest Software.

PAGE 22 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

39.     NIKE undertook its own calculation of the amount that it owed to Quest for overdeployment of Quest Software, based upon the inventoried "unauthorized users" of that software and Quest's current license fees for such software.  NIKE determined that the amount it owed under Section 12 of the SLSA was $348,664.74 and, on or about September 15, 2017, offered to pay this amount to Quest.

40.     Quest refused to accept NIKE's tender of this amount.

41.     Instead, Quest demanded payment by NIKE of almost 45 times the amount that NIKE actually owed.  This demand was improper and asserted in bad faith and for the purpose of obtaining funds to which Quest was not entitled.  NIKE therefore refused to pay this amount.

42.     NIKE continued in good faith to attempt to resolve this dispute over the subsequent months, and responded promptly to Quest's additional requests for information.  However, Quest refused to withdraw its demands for payments far in excess of the amount that NIKE owed under the SLSA.

**F.      Quest's Bad-Faith Refusal To Provide Maintenance And Support Services To NIKE**

43.     An important component of the SLSA is Quest's obligations to provide maintenance and support services for the software that it licenses to NIKE.

44.     Such maintenance and support is important to NIKE, as it would be to any user of Quest Software.  Quest's maintenance and support includes, but is not limited to, updates and enhancements to the Quest Software (including those made necessary by changes and upgrades to the underlying Oracle database software), security improvements to protect against hacking, malware and other outside threats, and support where problems are encountered in operation of Quest Software.  Such maintenance and support is important to NIKE, as it would be to any user of Quest Software.

PAGE 23 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

45.     Without such maintenance and support services, the Quest Software installed at NIKE would degrade in performance, would become incompatible with the underlying Oracle database software, and would become vulnerable to hacking, malware, and other outside threats. In addition, NIKE would lose access to Quest's support and troubleshooting services, which would make it more difficult or impossible to resolve operational problems encountered during operation of the Quest Software.

46.     Quest is aware of the importance of its maintenance and support services to its actual and potential licensees.  Indeed, Quest represents to actual and potential licensees of its software that those services are a vital aspect of its software and a reason for choosing Quest over its competitors.  *See, e.g.*, https://support.quest.com/pdf/Quest-Support-Services-Datasheet.pdf ("When selecting an enterprise software provider, the strength and quality of its support services is as important as the benefits of the products….[W]e strive to help you maximize your software investment by offering a wide range of global support services to accommodate the varying needs of your organization …. 24x7.  Support is essential if you are performing critical IT operations such as performance monitoring, data protection, identity management or security.")

47.     Under Section 6 of the SLSA, Quest is obligated to provide NIKE with maintenance services during specified maintenance periods and for specified fees as set forth on an applicable order form, which services include, *inter alia*, making available to NIKE software product corrections, enhancements, and upgrades, providing technical/operational consultation services, and providing technical support for Quest software products (defined in the SLSA as "Maintenance Services").

48.     Section 6 of the SLSA also provides that "[a]t the end of each Maintenance Period for a particular Licensed Software, Quest shall generate and deliver to Licensee an invoice to

renew Maintenance Services for the particular Licensed Software for an additional twelve-month period.  Licensee may elect not to renew Maintenance Services for the particular Licensed Software on all or any Licensed Software by terminating maintenance in writing, in which case Quest will no longer be responsible for providing maintenance for the particular Licensed Software for which Licensee has terminated Maintenance Services."

49.     Section 6 of the SLSA also provides that "Quest may elect not to renew Maintenance Services, but only in the event that that Quest is no longer maintaining the particular Product for its customers generally.  In the event Quest elects to terminate Maintenance Service for a particular Software Product, Quest must provide Licensee with four (4) years written notice."

50.     Section 12 of the SLSA provides, in relevant part that "[p]rovided that Licensee pays the underpayment as described above, Licensee shall not be deemed to be in breach of this Agreement or of any licensing rights granted hereunder."

51.     NIKE has fully paid Quest for Maintenance Services from the signing of the SLSA through the present date.

52.     On December 28, 2017, Quest informed NIKE that it would not renew Maintenance Services for Quest Software products licensed by NIKE.  When NIKE protested Quest's refusal, Quest responded, on or about January 3, 2018, that "Nike is in the middle of an active compliance verification process. Until that process is resolved, and Nike's entitlement becomes clear, Quest is not in a position to grant a renewal."

53.     Quest's refusal to provide NIKE with Maintenance Services occurred after NIKE had tendered to Quest full payment of all overdeployment amounts due to Quest under Section 12 of the SLSA.

PAGE 25 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

54.     As a result, Quest was not entitled to refuse to renew Maintenance Services for NIKE, because NIKE had a contractual right to such Maintenance Services.

55.     Quest's refusal to renew Maintenance Services for NIKE was a material breach of the SLSA by Quest.

56.     Quest's refusal to renew Maintenance Services for NIKE was a bad faith tactic by Quest, intended to force NIKE to pay amounts not due to Quest under Section 12 of the SLSA.

57.     As a result of Quest's refusal to provide NIKE with Maintenance Services required by Section 6 of the SLSA, Nike has been and will continue to be injured, including but not limited to injury arising from lack of access to updates and enhancements necessary for the optimal use of Quest Software, lack of protection against hacking, malware, and other outside threats, and lack of support and troubleshooting for operational problems encountered during operation of Quest Software.

**G.      Quest's Bad Faith and Predatory Audit Practices**

58.     Upon information and belief, in or about November 1, 2016, Quest was sold by its owner, Dell, to venture capital firms.  Upon information and belief, the new management of Quest sought to make the acquisition more profitable by undertaking a campaign to audit Quest licensees and to assert bad faith and predatory positions against Quest licensees in the course of such audits, with the goal of forcing licensees to pay settlements that substantially exceed Quest's contractual entitlement to payment under its license agreements.

59.     Upon information and belief, Quest's bad faith and predatory audit practices against its licensees have included, but are not limited to: (a) substantially increasing the number of audits of licensees; (b) in conducting audits, disregarding the contractual terms of its license agreements regarding calculation of amounts due for overdeployment, and demanding grossly

PAGE 26 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

exaggerated and unjustified payments from licensees for overdeployment; (c) refusing to accept payment or tender of payment by licensees for overdeployment that has been calculated by the licensees in accordance with contractual terms; (d) demanding payment from licensees for uses of freeware and trialware versions of Quest software, even where such payments are not required under agreements between Quest and the licensees or the terms under which such versions are made available to the public; (e) demanding overdeployment payments in excess of Quest's published licensing prices where licensees are alleged to have used license keys or other access devices not provided by Quest to access licensed Quest software, even where such use is not prohibited by Quest's agreement with the licensee; (f) threatening and/or commencing claims against licensees that assert damage claims under the Copyright Act or the Digital Millennium Copyright Act for alleged licensee overdeployment, with knowledge that such claims are not permitted and that Quest's sole and exclusive remedy for overdeployment is payment by the licensee of amounts due under the licensees' agreements with Quest; and (g) in order to exert coercive pressure on licensees to accede to Quest's predatory demands for payment, refusing to provide or renew Maintenance Services to those licensees, even though Quest is aware that such refusals are breaches of the license agreement between Quest and its licensee, and that such refusals damage the licensee by denying it necessary security and software upgrades.

60.    At the time it filed the present action against NIKE, Quest was aware that its sole and exclusive remedy for overdeployment determined during a licensee audit is payment of the amounts due for overdeployment pursuant to its license agreement, and that it cannot maintain a copyright infringement action for the same conduct. According to a decision in the action *Quest Software, Inc. v. DirecTV Operations, LLC* , filed by Quest in the US District Court for the Central District of California (Docket No. 8:09-CV-01232) and reported at 2011 WL 4500922 (C.D. Cal.

**PAGE 27 -** **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

Sept. 26, 2011) (attached as Exhibit D), Quest sued DirecTV Operations , LLC ("DirecTV") for breach of contract and copyright infringement.  Quest's claims were based on DirecTV's alleged overdeployment of Quest's software as allegedly revealed by Quest's conduct of an audit of DirecTV under the audit provision of the parties' software license agreement.  Similar to Quest's SLSA with NIKE, the terms of the Quest-DirecTV software license agreement provided that overdeployment does not constitute an automatic breach, but instead permitted DirecTV to overdeploy the software provided that it paid Quest for using the software beyond the scope of the agreement as a "true-up."

61.      On September 26, 2011, the court granted DirecTV's partial motion for summary judgment and dismissed Quest's copyright infringement claim, determining that the overdeployment and "true-up" provisions of the Quest-DirecTV license agreements permitted DirecTV to make use of Quest software above its licensed number of central processing units (CPUs) and those provisions, are contractual covenants, not conditions, because they do not concern the scope of the license but only the number of CPUs running Quest software.  Accordingly, Quest had at most a claim for breach of contract but could not assert copyright infringement for overdeployment.

62.      Upon information and belief, Quest has recently undertaken predatory audits against other Quest licensees in addition to NIKE.

63.      On November 28, 2017, Quest initiated an action in the US District Court for the Western District of Washington against World Fuel Services Corporation ("WFSC") (Docket No. 3:17-CV-05989) for breach of licensing agreements, copyright infringement, and violation of the DMCA.  Quest's claims are based on WFSC's alleged overdeployment of Quest's software, as allegedly revealed by Quest's invocation of the audit provision of the parties' software license

agreement, as well as WFSC's alleged use of "pirated" authentication keys in respect of Quest's software.

64.    On March 27, 2018, Quest initiated an action in the US District Court for the Western District of Texas against Electric Reliability Council of Texas ("ERCOT") (Docket No. 1:18-CV-00262) for breach of licensing agreement and copyright infringement.  Quest's claims are based on ERCOT's alleged overdeployment of Quest's software, as allegedly revealed by Quest's invocation of the audit provision of the parties' software license agreement.

65.    On May 7, 2018, Quest initiated an action in the US District Court for the Central District of California (Southern Division) against HCL America, Inc. and Becton, Dickinson & Company (Docket No. 8:18-CV-00800) for breach of contract and copyright infringement arising out of a software licensing agreement and related agreements between the parties.  Quest's claims are also based on defendants' alleged overdeployment of Quest's software.

66.    Upon information and belief, Quest's copyright infringement claims against NIKE and its other licensees are asserted in bad faith and for predatory purposes because, as set forth in the DirecTV decision, a licensee's failure to pay Quest amounts due under a licensing agreement for overdeployment of software may give rise to a breach of contract claim, but does not permit assertion of a copyright infringement claim.  Upon information and belief, Quest is asserting copyright infringement claims against NIKE and its other licensees as part of its predatory audit practices, in order to inflate its claimed damages and force its licensees into unfair settlements.

PAGE 29 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

## FIRST COUNTERCLAIM

### (Declaration of the Parties' Rights and Remedies Under the SLSA)

67.    NIKE incorporates by reference the allegations contained in the preceding paragraphs of these Counterclaims as though set forth in their entirety.

68.    The facts as alleged above show that there is a substantial controversy between plaintiff and defendant regarding the meaning and legal effect of the SLSA with respect to:

   a.   whether the amount to be paid by NIKE for any overdeployment of Quest Software is to be calculated on the basis of "unauthorized users" of such software, as provided in Section 12 of the SLSA, or on the basis of the number of persons with theoretical access to such software, as Quest maintains;

   b.   whether such calculation of overdeployment is to include or exclude use by NIKE of expired freeware and trialware versions of Quest Software, when the SLSA does not require NIKE to pay for use of such versions;

   c.   whether NIKE is required to pay interest to Quest on amounts due to Quest under Section 12 of the SLSA, when the SLSA does not provide for payment of interest for amounts due for overdeployment;

   d.   whether NIKE is required to pay any "multiplier" to Quest for a software license included in an overdeployment calculation where the Quest Software has allegedly been accessed through a license key or other device not provided by Quest, where the SLSA does not provide for any such multiplier;

   e.   whether Quest has waived any rights and remedies with respect to NIKE's overdeployment of Quest Software, including claims for copyright infringement

PAGE 30 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

and violation of the Digital Millennium Copyright Act, other than the right to be

compensated in accordance with Section 12 of the SLSA; and

f.   whether Quest may withhold or refuse to provide NIKE with Maintenance

Services or renew such Maintenance Services as required by Section 6 of the

SLSA, under the circumstances alleged above.

69.      The parties have adverse legal interests with regard to this controversy of

sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

70.      The declaratory judgment sought herein may be made by the Court as a matter of

law, based solely upon the provisions of the SLSA, attached hereto as Exhibit A, and applicable

law.

71.      The declaratory judgment sought herein will resolve, clarify and settle the

respective rights and obligations of the parties, and permit them to resolve any remaining disputes

without further litigation and use of the Court's time and resources.

72.      The Court should therefore issue an order declaring, determining and adjudging

that under the SLSA:

a.   NIKE's obligation to pay Quest for overdeployment of Quest Software is to be

calculated on the basis of actual unauthorized users of that Quest Software;

b.   NIKE is not required to pay Quest for use by NIKE of freeware or trial versions

of Quest Software;

c.   NIKE is not required to pay interest to Quest on amounts determined to be owed

by NIKE to Quest for overdeployment of Quest Software under Section 12 of the

SLSA;

PAGE 31 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND
              COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT
              AND DEMAND FOR JURY TRIAL**

d.  In calculating any amounts due to Quest for overdeployment of Quest Software, the license price to be used for the calculation is the negotiated fee applicable to the particular software program, whether or not the license key or other device used to gain access to that program was supplied by Quest;

e.  Quest's sole and exclusive remedy for overdeployment (including that involving trialware, freeware, and license keys and other access devices not provided by Quest) is payment by NIKE of amounts determined in accordance with Section 12 of the SLSA; and

f.  Quest is required to provide and renew Maintenance Services to NIKE in accordance with Section 6 of the SLSA.

## <u>SECOND COUNTERCLAIM</u>

### (Breach of Contract)

73.    NIKE incorporates by reference the allegations contained in the preceding paragraphs of these Counterclaims as though set forth in their entirety.

74.    On November 1, 2001, NIKE and Quest entered into the SLSA, which is binding, enforceable, and remains in effect to this day.

75.    NIKE has performed all of the conditions, covenants, and promises required to be performed by it in accordance with the terms and conditions of the SLSA.  Pursuant to Section 12 of the SLSA, NIKE is not in breach of the SLSA with respect to overdeployment of Quest software because NIKE has offered to pay to Quest all amounts due under Section 12.

76.    Under Section 6 of the SLSA, Quest is obligated to provide Maintenance Services for the software products licensed to NIKE under the SLSA.

PAGE 32 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

77.     Under Section 6 of the SLSA, Quest "may elect not to renew Maintenance Services, but only in the event that Quest is no longer maintaining the particular Product for its customers generally."

78.     Upon information and belief, Quest continues to provide Maintenance Services for all software products licensed to NIKE to its customers generally.

79.     Section 6 of the SLSA provides that "[i]n the event Quest elects to terminate Maintenance Services for a particular Software Product, Quest must provide Licensee with four (4) years written notice."

80.     Quest has not provided NIKE with four (4) years written notice of termination of Maintenance Services for any software products licensed to NIKE.

81.     Quest has refused, and continues to refuse, to provide and renew Maintenance Services for NIKE in respect of software products licensed to NIKE.

82.     Such refusal constitutes a material breach by Quest of the SLSA.

83.     As a result of Quest's breach of the SLSA, NIKE has been, and will continue to be damaged, as alleged above.

84.     NIKE is entitled to recover damages from Quest for said breach, in an amount to be determined at trial.

## **THIRD COUNTERCLAIM**

### **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

85.     NIKE incorporates by reference the allegations contained in the preceding paragraphs of these Counterclaims as though set forth in their entirety.

86.     Oregon law implies a covenant of good faith and fair dealing into every contract.

PAGE 33 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

87.     Quest's demand that NIKE pay amounts not due to Quest under Section 12 of the SLSA before Quest will provide and renew Maintenance Services to NIKE constitutes a bad faith, willful rendering of imperfect performance of Quest's obligations under the SLSA, and is designed solely to be punitive to NIKE.

88.     Quest's refusal to provide and renew Maintenance Services to NIKE is a material breach of the implied covenant of good faith and fair dealing of the SLSA as it has unfairly frustrated the agreed common purpose of the SLSA, and has interfered with and prevented NIKE from obtaining the benefit of its bargain under the SLSA.

89.     As a direct and proximate result of Quest's substantial and material breach of the implied covenant of good faith and fair dealing in connection with the SLSA, NIKE has incurred, and will continue to incur, actual and significant damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, NIKE requests that the Court:

A.     Enter judgment in favor of NIKE in this action, and against Quest, dismissing Quest's Complaint in its entirety, with prejudice, and deny Quest all requested relief;

B.     Enter judgment in favor of NIKE, and against Quest, on NIKE's Counterclaims, and award such compensatory damages as the trier of fact may determine;

C.     Issue the declaratory judgment prayed for in the First Counterclaim;

D.     Award NIKE its attorney's fees and costs incurred in this litigation, as permitted under 17 U.S.C. § 505, and interest as permitted by law; and

H.     Grant NIKE all other and further relief that the Court deems appropriate.

PAGE 34 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

Dated: May 31, 2018                          Respectfully Submitted,

_s/ B. John Casey_
B. John Casey, OSB No. 120025
john.casey@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone: (503) 224-3380
Facsimile:  (503)  220-2480

Andrew L. Deutsch, CSB No. 319286
andrew.deutsch@dlapiper.com
_Admitted pro hac vice_
DLA PIPER LLP
2000 Avenue of the Stars
Los Angeles, CA  90067
Telephone: (310) 595-3000
Facsimile:  (310)  595-3030

Francis W. Ryan, NYB No.  2684058
frank.ryan@dlapiper.com
_Admitted pro hac vice_
Kerry A. O'Neill, NYB No. 5143995
kerry.oneill@dlapiper.com
_Admitted pro hac vice_
DLA PIPER LLP
1251 Avenue of the Americas
New York, NY  10020
Telephone: (212) 335-4850
Facsimile:  (212) 335-4501

Attorneys for Defendant /Counterclaimant
NIKE, Inc.

PAGE 35 - **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL**

# Exhibit A

**NIKE, Inc.**

| | |
|---|---|
| **DATE** | This Agreement is made this 1st day of November, 2001, |

by and between:

**PARTIES**

*Licensee and Customer*: NIKE, Inc., a corporation organized and existing under Oregon law, having a principal place of business at One Bowerman Drive, Beaverton, Oregon 97005-6453, on behalf of NIKE, Inc. and its Affiliates (hereinafter referred to as "NIKE" or "Licensee").

and

*Licensor and Service Provider:* Quest Software, Inc., a corporation organized and existing under California law, having a principal place of business at 8001 Irvine Center Drive, Irvine, CA 92618 (hereinafter referred to as "Quest" or "Licensor.")

## RECITALS

WHEREAS:

A.    NIKE is engaged in the design, development, manufacture, distribution and sale of footwear, apparel, accessories, athletic equipment, and their components and related products;

B.    NIKE wishes to acquire software applications and services from Quest;

C.    Quest is the developer of and exclusive owner of, and/or has the right to license to others, a series of computer software programs;

D.    Quest wishes to grant to NIKE and NIKE wishes to accept from Quest, the right to use the software.

NOW, THEREFORE, in consideration of the foregoing and the promises contained herein, the Parties agree:

## 1. Definitions.

Section numbers and exhibit numbers refer to the sections and exhibits of this Software License and Service Agreement. Unless otherwise defined herein, terms that are capitalized in this Agreement shall have the meanings set forth below :

1.1    "**Affiliate**" means, as to either Party, any company controlled by, controlling, or under common control with Party.

1.2    "**Agreement**" means this Software License and Service Agreement dated November 1, 2001 between Licensee and Quest.

1.3    "**Agreement Effective Date**" means the date set forth on the cover page of this Agreement.

1.4    "**Deliverables**" means products, goods, or property (including intellectual property) produced by Quest in connection with or incidental to the Services.

**NIKE, Inc.**

1.5 **"Documentation"** means published materials that describe the features of or functions of the Software Product, or of any Customization or Upgrade to the Software Product, in sufficient detail to permit their use, including but not limited to reference guides, user or technical manuals.

1.6 **"Educational Materials"** means those training materials which may be included with shipment of Software Products or which Licensee may from time to time order from Quest.

1.7 **"Enterprise"** means NIKE, Inc. and NIKE's Affiliates regardless of location of operation.

1.8 **"Global"** means pertaining to the worldwide operations of Licensee without geographical restriction.

1.9 **"Licensee"** means NIKE, Inc. or the particular Affiliate of NIKE, Inc. which is a party to a duly executed Order Form under this Agreement.

1.10 **"Licensed Software"** means the particular Software Product or Products which Licensee is licensing from Quest pursuant to this Agreement, as specified on a duly executed Order Form.

1.11 **"Maintenance Period"** means the one year period beginning on the date of the first invoice for the Licensed Software or from the conclusion of any previous maintenance period provided that Licensee is current on all fees due.

1.11.1 **"Maintenance Services"** means the Services described in *Section 6, Services,* in this Agreement.

1.12 **"NIKE Site"** means any one of the buildings, plants, facilities, or remote locations where Licensee or a Licensee Affiliate regularly conducts business, regardless of geographical location.

1.13 **"Order Effective Date"** means the date on which an Order Form is executed by both Parties.

1.14 **"Order Form"** means the Quest ordering document (each of which will be attached hereto as *Exhibit A-1* and so on) which is signed by both parties and incorporates this Agreement by reference and in which the Parties list the specific Software Products and/or Services (including applicable pricing) being ordered by Licensee pursuant to this Agreement.

1.15 **"Party"** means NIKE or Quest (collectively, "the Parties.")

1.16 **"Platform"** means the computer hardware configuration and operating system specified in the applicable Order Form.

1.17 **"Server"** means a computer or workstation on a NIKE Site where the Licensed Software is installed.

1.18 **"Services"** means Maintenance Services and other services rendered hereunder by Quest for Licensee.

1.19 **"Software Product"** means any computer program offered by Quest.

1.20 **"Source Code"** means, for any Licensed Software product, (a) a complete copy of the source code files, link list object files, data base files, existing documentation, (b) identification, including name and version number, of the tool or tools used to translate Source Code into machine-executable code, and (c) or such other information as is necessary for a reasonably skilled programmer or analyst to understand and maintain the software programs constituting the Licensed Software in the versions licensed to Licensee under this Agreement.

1.21 **"Upgrade"** means any new Release or new Version, as those terms are defined in Section 6.

1.22 **"Users"** means employees of Licensee and persons or entities under contract to perform services for Licensee and Affiliates of Licensee, provided that, to the extent Licensee makes the Licensed Software available to third parties, Licensee shall be responsible for the compliance of all such individuals with this Agreement.

1.23 **"Warranty Period"** means, as to any Licensed Software Product, the ninety (90) day period commencing on the Order Effective Date.

## 2  Scope of License.

2.1 <u>License Grant</u>. Quest hereby conveys to Licensee a non-exclusive, non-transferable, non-sublicensable, perpetual, <u>Global license</u> to: 

    A.   install, integrate, implement, test, and operate, and use the Licensed Software; and

    B.   use the Documentation for purposes of supporting use of the Licensed Software; and

    C.   use the Educational Materials for the express purpose of providing internal training, only to Users concerning Quest products.

This license consists of the right, for each copy of the Licensed Software that Quest is obligated to deliver in accordance with the applicable Order Form, to install, use, access, run, or otherwise interact with such copy on a single computer at a time, in and for Licensee's own purposes and business operations, in accordance with the related Documentation, subject, however, to any restrictions set forth on the applicable Order Form (such as Tier restrictions). The computer on which the Licensed Software is installed may be located (a) at a NIKE Site; or (b) on the site of a third party service provider which is operating the Licensed Software for Licensee's benefit. The

Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

Page 2 of 8

Exhibit A - Nike Answer/Counterclaims
Page 2 of 25

license grant also includes the right to use Quest technical training materials in connection with Quest training Services provided hereunder. No other use is permitted. If the license fee for the Licensed Software is determined by reference to a tier, then the Licensed Software may be transferred from one computer to another computer within the same Tier at no additional cost. If Licensee transfers such Licensed Software to another computer of a higher Tier than the Tier indicated in the Order Form, Licensee shall become obligated to pay to Quest an additional license fee for such Licensed Software based on the difference between Quest's then discounted license fee for the originally licensed Tier and its discounted license fee for the Tier to which such Licensed Software is transferred.

2.2    Restrictions on Use. Quest reserves any rights in the Licensed Software not expressly granted to Licensee and retains title and full ownership rights under the copyright laws of the United States or any other jurisdiction or under any federal, state or foreign laws. Except as provided herein and in Section 7, Quest is not obligated to provide and Licensee acquires no right of any kind with respect to any source code for the Licensed Software. Licensee shall not, nor permit any third party to (a) disassemble, decompile, or reverse engineer the Licensed Software or (b) modify, enhance, or prepare derivatives of the Licensed Software; or (c) distribute, sublicense, loan, or otherwise transfer the Software Product or any component thereof to third parties other than Affiliates.

2.3    Copies. Quest shall provide the number of copies of the Licensed Software and of the Documentation specified on the Order Form. Licensee may make one copy (in machine-readable form only) of each copy of the Licensed Software solely for backup or disaster recovery purposes, provided that any proprietary legends are reproduced.

## 3. Delivery

Quest shall deliver the Licensed Software as set forth in the Order Form.

## 4. Expanding the License Scope.

Licensee and its Affiliates may expand the scope of the licensing rights granted hereunder to (a) include additional Software Products, or to (b) allow additional use of the existing Licensed Software, in either case by submitting a signed Order Form to Quest and Quest shall accept such order by countersigning the Order Form.

## 5.   Deleted by Agreement of the Parties.

## 6. Services.

During any Maintenance Period and for the fees as set forth on the applicable Order Form, Quest shall provide the Maintenance Services as described in this Section. Quest may, from time to time, request dial-in access to Licensee's system, as necessary to perform Maintenance Services, and Licensee may grant such dial-in access at Licensee's sole discretion. Quest's ability to provide some Maintenance Services will be impaired without dial-in access to Licensee's system.    At the end of each Maintenance Period for a particular Licensed Software, Quest shall generate and deliver to Licensee an invoice to renew Maintenance Services for the particular Licensed Software for an additional twelve-month period. Licensee may elect not to renew Maintenance Services on all or any Licensed Software or by terminating maintenance in writing, in which case Quest will no longer be responsible for providing maintenance for the particular Licensed Software for which Licensee has terminated Maintenance Services.  Quest may elect not to renew Maintenance Services, but only in the event that Quest is no longer maintaining the particular Product for its customers generally.  In the event Quest elects to terminate Maintenance Service for a particular Software Product, Quest must provide Licensee with four (4) years written notice.  In the event that maintenance has lapsed, Licensee shall have the right to reinstate Maintenance Services upon payment of all past maintenance fees calculated in accordance with *Exhibit B, Pricing*, which is attached hereto and is hereby incorporated into this Agreement by this reference.   Maintenance Services shall include the following:

- Quest shall make Software Product corrections, enhancements and upgrades available to Licensee if and when it makes them generally available to its maintenance subscribers.
- Quest shall respond to unlimited communications from Licensee that report software failures.
- Quest shall respond to a reasonable number of communications from Licensee's Technical Coordinators that request consultation on the operational/technical aspects of the Software.
- For all Software other than SQL Navigator and TOAD, Quest's support service shall be available via telephone or email on business days between the hours of 5:00 a.m. and 5:00p.m. PST/PDT. During those hours, Quest shall respond to inquiries within four (4) hours of receipt of such inquiries.  For the SQL Navigator and TOAD Software, Quest's support service shall be available via email or the Internet on business days between the hours of 5:00a.m. and 5:00 p.m. PST/PDT.  During those hours, Quest shall respond via email to inquiries within twenty-four (24) hours of receipt.
- For all Live-Reorg software licensed by Quest to Licensor, Maintenance Services also include 24x7 Severity Level 1 support, after-hours phone support 365 days/year.

Additional details of the Maintenance Services described above are included in the 'Quest Software Technical Support User Guide'

Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

Page 3 of 8

which is attached hereto as Exhibit C and is hereby incorporated into this Agreement.

## 7. Source Code Escrow.

Quest agrees to maintain Licensee as a subscriber to Quest's standard third-party source code escrow account holding a current version of the source code for the Licensed Software during the Maintenance Period for such Licensed Software. Such escrow account will provide for instructions for release of one copy of the source code for such Licensed Software to account subscribers in good standing in the event of a Release Condition (as defined below), whereupon Licensee shall have a nonexclusive right to use and make working copies of the Source Code and Documentation for the purposes of supporting and maintaining the Licensed Software for its use as permitted under this Agreement. The Source Code shall be deemed Licensor's confidential information subject to the nondisclosure provisions of the Agreement. A "Release Condition" shall occur if at any time during the term of the Agreement, Licensor files a petition of bankruptcy, terminates its business operations, or ceases to make Maintenance Services generally available to licensees of such Licensed Software, unless within a sixty (60) day period, Quest provides to Licensee adequate assurances, reasonably acceptable to Licensee, of its continuing ability and willingness to fulfill all of its maintenance and support obligations hereunder.

## 8. Fees and Payment Terms.

8.1   Fees/Invoices.  The pricing, discount, and other provisions, terms, and conditions set forth in Exhibit B, Pricing, shall be effective throughout the term of this Agreement.  The fees set forth in the applicable Order Form (s) shall reflect the pricing and discount provisions of Exhibit B and be full payment for (a) licensing of and first year of Maintenance Services for the Software Product or Products designated; and (b) the training and installation Services indicated (if any).

8.2   Additional Products.  In the event that Licensee expands the scope of the license to include (a) additional licensed use or (b) additional products, as described in Section 4, the fee applicable to such software orders shall be as set forth in Exhibit B, Pricing.  Order Forms shall be unenforceable to the extent they contain pricing terms inconsistent with Exhibit B, Pricing, and shall be automatically revised to reflect the agreed pricing set forth in Exhibit B.

8.3   Taxes.  The fees specified in this Agreement do not include taxes, duties or fees.  Licensee shall pay or reimburse Quest for any sales, use, property, value-added, withholding and other taxes, and all customs or other duties, and any import, warehouse or other fees, associated with the importation or delivery based on the Software Products licensed or Services provided in this Agreement and/or use of the Software Products or Services by Licensee or the Enterprise which are imposed upon Quest in connection with this Agreement.  Quest is solely responsible for paying or otherwise discharging (a) any taxes imposed upon Quest based upon Quest's net income or assets; or (b) sales and use taxes for which Licensee has provided a valid tax exemption certificate within sixty (60) days of the Agreement Effective Date; or (c) payroll taxes in respect of Quest's employees.

8.4   Payment Terms.  Licensee shall make all payments in U.S. dollars.  Payments shall be due thirty (30) days after Licensee's receipt of a proper invoice.

## 9. Performance Warranty.

9.1.   Limited Warranty.  Quest warrants that during the Warranty Period: (a) The Licensed Software shall conform in all material respects with Quest's Documentation; and (b) the material of the media on which the Licensed Software is delivered shall be free from material  defects in materials and workmanship under normal use which is consistent with Documentation.

9.2.   Remedy for Nonconformity.  If during the Warranty Period, the Licensed Software does not perform in accordance with the Documentation, Licensee shall notify Quest in writing, specifying in reasonable detail the reason for the claimed breach, as soon as practicable after discovery of the breach. Quest shall then, at its own expense, repair, replace, or make such corrections to the Licensed Software as are necessary to cure the deficiency.  Quest shall notify Licensee when such corrections have been completed, and the Warranty Period shall be extended for a period of time equal to the interval in which the Licensed Software was nonconforming or defective and not available for Licensee's use.  Licensee's exclusive remedy, and Quest's sole obligation, for any such breach of warranty shall be for Quest to replace the defective media and to correct or provide a workaround for reproducible errors that cause a breach of the warranty within a reasonable time considering the severity of the error and its effect on Licensee, or, if repair or correction is not possible Licensee can elect to terminate the license for that particular Software Product and, upon de-installation and return of the Licensed Product by Licensee to Quest, Quest shall refund the license fees paid for the nonconforming Licensed Software.

9.3.   Remedy for Defective Media.  If during the Warranty Period, the material of the media on which the Licensed Software is defective, Licensee shall notify Quest and Quest shall promptly repair or replace the media.

## 10. Warranty of Title.

10.1   Non-infringement.  Quest represents and warrants that it owns or has the absolute right to license, or otherwise grant the rights in the Licensed Software conveyed to Licensee herein, and that neither the Licensed Software nor any Customizations or Upgrades, infringes any  patent,  copyrights, or other intellectual property right of, or misappropriates the trade secrets of, any person or entity.

10.2   Defense and Indemnity.  Quest shall defend Licensee and Licensee's officers and directors, agents, and employees, and Licensee's Affiliates and the officers, directors, agents, and employees of Licensee's Affiliates, against any claim or legal action brought by a third party arising out of a claim of infringement of a patent, copyrights, or other intellectual property rights, or misappropriation of trade secrets by Licensee arising as a result of use of the Software Products by the Enterprise in accordance with the terms and provisions of this Agreement. Quest shall indemnify and hold harmless such parties against any expenses, liabilities, costs, settlements or judgments, including attorneys fees at trial and at appeal, in connection with any such third party claims or actions. Licensee agrees to notify Quest in writing of such claim or suit promptly after the pleading, demand letter, or other notice is

Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

Page 4 of 8

served upon Licensee. Quest's indemnification obligation shall only extend to those claims where Quest has sole control of the defense, investigation and/or settlement thereof; *provided, however,* that Quest shall not enter into any settlement that obligates Licensee to incur any expense without Licensee's prior written consent, and *further provided,* that Licensee shall have the right to be represented at its own expense by independent counsel of Licensee's own choosing in connection with such claim or suit. Licensee shall, at the expense of Quest, cooperate with Quest in defense of such suit.

10.4 <u>Limitation</u>. Notwithstanding the foregoing, Quest has no obligation to indemnify Licensee in connection with claims of infringement or misappropriation, to the extent such claims (i) arise out of any modification of the System other than one developed by or on behalf of Quest; (ii) arise out of use of a bundled product of which the Licensed Software is a component (except to the extent that the product is bundled by Quest), if the Licensed Software alone would not have been infringing; or (iii) are the direct result of the use by Licensee of software not supplied by Quest. Furthermore, if Quest has notified Licensee in writing that the Licensed Software may be the subject of an infringement or misappropriation claim, and has (a) provided Licensee with an Upgrade which is a non-infringing version providing the same, or greater, functionality and performance, and (b) provided at Quest's own expense Training (if necessary) for the Upgrade, and Licensee does not promptly replace all copies of the infringing version of the Licensed Software with the non-infringing version, then Quest shall have no obligation to indemnify Licensee pursuant to this Section 10 to the extent the infringement or misappropriation claim relates to Licensee's use of the infringing Licensed Software after delivery of the non-infringing version.

## 11. General Warranties.

The following warranties shall be in effect for the entire term of this Agreement, except where noted otherwise.

*a. No surreptitious code.* Quest represents and warrants that:

    **i. No self-help code.** The Licensed Software contains access code, to which Licensee will be given the access key, but no other code that is designed to disable the Software, or any feature or component thereof or to disable any feature or component thereof after passage of a particular period of time.; and

    **ii. No unauthorized code.** At the time of delivery the Licensed Software does not (and during any Maintenance Period, the Licensed Software and any Upgrade shall not) contain any Trojan horses, traps, worms or other software routines which might

        A.   erase or alter the Licensed Software, or erase, corrupt or alter any of Licensee's files, data, or other software, or harm in any way the hardware or related components; or

        B.   permit access to, or extract or collect data, from any Licensee systems; or

        C.   perform any functions other than those specified in the Documentation.

*b. Disclaimer.* Quest does not warrant that the operation of the Licensed Software will be uninterrupted or error-free.

11.1 <u>Pending litigation</u>. Quest represents and warrants that as of the Agreement Effective Date, there are no actual, threatened, or pending legal actions which would have an adverse affect on Quest's performance of this Agreement.

11.2 The foregoing warranties set forth in Sections 9, 10 & 11 herein shall be the only warranties provided by QUEST AND QUEST EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE.

## 12. Audit.

Quest shall have the right to perform, or cause an independent accounting firm to perform, at Quest's sole expense, an audit to verify that Licensee is using the Licensed Software in compliance with this Agreement; *provided, however* that if the Licensed Software is installed at a third party Site, Licensee shall make reasonable efforts to facilitate an audit. Any such audit shall be conducted upon prior notice of not less than thirty (30) days to a) the person designated in the applicable Software Order; and b) the Licensee IT Department; and c) the Licensee Legal Department. Any such audit shall be performed during ordinary business hours at a Site approved by Licensee, subject to reasonable security and access restrictions. Licensee shall be permitted to have Licensee personnel present during the audit. In the event that an audit conducted as set forth herein discloses that Licensee has caused or permitted access to or use of the System by persons or entities that are not authorized under the terms of this Agreement to such use or access, Licensee shall pay Quest the underpayment, in the amount of the negotiated fee applicable to the particular Software Product or Product to which unauthorized access was permitted, for all such unauthorized users. Provided that Licensee pays the underpayment as described above, Licensee shall not be deemed to be in breach of this Agreement or of any licensing rights granted hereunder. Audits shall be initiated no more often than once every eighteen months and each audit shall be completed within forty-five (45) days of Licensee's receipt of notice.

## 13. Export.

Subject to the restrictions set forth below, Licensee shall have the right to use the System at Licensee Sites outside the United States. Licensee may, but shall not be required to, deliver the Licensed Software to locations outside the United States in order to exercise such right. In the event Licensee wishes to use the Licensed Software outside the United States, Licensee shall provide Quest with written notice identifying the person or entity, and the location where the Licensed Software is to be used , whereupon Quest shall promptly deliver the Software to the specified individuals or entity at the specified location. Quest represents and warrants that any delivery by Quest of the Licensed Software, or any other System components, to Licensee shall be in compliance with all applicable local, state, federal, and international laws, treaties, regulations, and ordinances; and in particular, that delivery shall comply with the U.S. Department of Commerce Export Administration Regulations. Both parties agree not to export or re-export the Licensed Software or the Documentation and Quest shall not be obligated to deliver Software or Documentation, to any country to which the United States has embargoed goods, to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Commerce Department's



Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

Table of Denial orders, or to any country for which the United States Export Administration Act, or any similar United States law or regulation requires an export license or other U.S. Government approval, unless the appropriate export license or approval has fist been obtained. Quest shall be responsible for filing applications for and obtaining all such licenses and approvals prior to delivering the Licensed Software or Documentation to a destination that requires such steps to be taken; provided, however, that Licensee shall pay or reimburse Quest upon request for any and all expenses incurred by Quest in connection with the performance of its obligations under this Section 13. In no event shall Licensee incur additional license fees or "uplift" charges in connection with use of the Licensed Software outside the United States; provided, however, that Licensee shall, upon prior notice from Quest, pay any taxes, tariffs, or export fees that may be validly imposed upon Quest by a government properly asserting jurisdiction, in order for Quest to effect the deliver abroad. Quest shall reasonably assist Licensee in obtaining such permits, licenses, or certifications as may be required by the destination country, in order to use the Licensed Software at Licensee Sites outside the USA, at Licensee's expense. Licensee shall (A) make best efforts to comply with all the legal requirements established under applicable export controls; and (B) cooperate with Quest in any official audit or inspection by governmental agency that relates to applicable export controls.

## 14. Non-disclosure Obligations.

Each Party acknowledges that performance of this Agreement may give it access to information disclosure of which would cause substantial or irreparable harm to the other Party.

14.1 Quest's confidential information. Quest's "Confidential Information" means Software, source code, object code, documentation and any proprietary tools, knowledge, or methodologies disclosed by Quest to Licensee under this Agreement. Licensee shall observe complete confidentiality with respect to the Confidential Information, and shall take all reasonable steps to protect the Confidential Information from any use, reproduction, publication, disclosure, or distribution except as specifically authorized by this Agreement. Licensee shall promptly notify Quest of any known unauthorized use or disclosure of the Confidential Information and will cooperate with Quest at Quest's expense in any litigation brought by Quest against third parties to protect its proprietary rights.

14.2 Licensee's confidential information. Licensee and Quest hereby agree that all of the following types of information are conclusively presumed to be Licensee's confidential and proprietary information, regardless of the form in which the information is expressed and regardless of the medium or media on which such information is stored, recorded, conveyed, or communicated: (a) cost, profit and other financial and accounting data, (b) personnel or human resources data and employee files, (c) manufacturing know-how, (d) business or marketing plans, strategies, policy statements, and forecasts, (e) product pricing information, (f) research and development, (g) identities of customers, vendors and suppliers, (h) information about competitors or their products, (i) production figures, (j) inventions (whether or not patentable), unpublished product specifications, product designs, or technical drawings, (k) the proprietary information of third parties, including software, as to which Licensee has undertaken confidentiality obligations to such third parties; and (l) all information disclosed by Licensee to Quest, or to which Quest gains access, in the course of

Software License and Service Agreement (dated 11/1/2001) Quest Software, Inc./NIKE, Inc.

performing this Agreement, whether through an intentional communication or transmission, or through inadvertent disclosure. This list shall not be treated as exhaustive, and protectible information shall include such information as Licensee may, from time to time, classify as proprietary or confidential and in general any other information which Licensee makes reasonable efforts to protect from disclosure, and which derives independent economic value from not being generally known. Quest shall protect Licensee's proprietary and confidential information from disclosure with the same degree of care that it would exercise in protecting its own information that it does not wish to be disclosed to the public, and at a minimum, with reasonable care. In particular, Quest shall (a) refrain from divulging confidential information to third parties and protect electronic files and other media on which such information is stored from unauthorized access by third parties under the control of Quest; and (b) instruct any Quest employee, contractor, agent, or representative who may, in the course of conducting Quest's business, have access to Licensee's confidential information, to refrain from divulging such information to any person without Licensee's prior written approval.

## 15. Publicity Restrictions.

Quest shall not (i) use Licensee's name, nor any Licensee trade name, logo, trademark, or service mark, whether registered or not, or the name, assumed business name, trade name, logo, trademark, or service mark, whether registered or not, of any Licensee affiliate, in connection with publicity, advertisements, promotion or in any other connection, or (ii) identify Licensee in any manner on Quest's customer list or its web site (or on any third party web site identifying Quest), or (iii) disclose to any third party the existence of this Agreement or the monetary value of this Agreement unless so required by a court or government agency of competent jurisdiction. Quest shall indemnify Licensee for reasonable costs and expenses, including attorneys' fees, incurred in connection with enforcing the provisions of this Section 15.

## 16. LIMITATION OF LIABILITY.

Except for Quest's obligations under Sections 10.2, 14 and 15, and Licensee's obligations under Sections 2 &14, in no event shall the liability of either Party for money damages arising under this Agreement exceed the total amount of fees, in the aggregate, paid by Licensee under this Agreement.  EXCEPT FOR DAMAGES ARISING UNDER SECTIONS 10.2, 14 and 15, IN NO EVENT WILL EITHER PARTY, ITS SUBSIDIARIES OR ANY OF THAT PARTY'S, DIRECTORS, OFFICERS, EMPLOYEES OR AFFILIATES OF ANY OF THE FOREGOING BE LIABLE TO THE OTHER PARTY WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT OR SPECIAL DAMAGES WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION AND THE LIKE), WHETHER FORESEEABLE OR UNFORESEEABLE, OR FOR COST OF PROCUREMENT OF SUBSTITUTE GOODS, TECHNOLOGY OR SERVICES, ARISING UNDER THIS AGREEMENT, REGARDLESS OF THE BASIS OF THE CLAIM AND EVEN IF EITHER PARTY OR A REPRESENTATIVE OF

Page 6 of 8

EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

## 17. Notices.

Every notice required or contemplated by this Agreement shall be (a) delivered in person; or (b) sent by courier, overnight delivery service, or certified mail, return receipt requested, postage prepaid, to the addresses indicated below, or (c) transmitted by facsimile, to the fax number indicated on the applicable Software Order with a copy by U.S. Mail. Notice sent by courier, express mail, certified mail or registered mail shall be deemed effective on the date officially recorded as delivered, according to return receipt or other record of delivery. Notices sent by facsimile shall be deemed effective upon the printing of the fax machine journal confirmation report. Either Party may, by written notice, change the address for delivery of notices.

| For Licensee: | For Licensor: |
|---|---|
| NIKE, Inc.<br>Corporate Procurement<br>Contracts Manager, MS-4<br>One Bowerman Drive<br>Beaverton, OR<br>97005-6453 | Quest Software Inc.<br><br>(Attn: Contracts Manager)<br>8001 Irvine Center Drive<br>Irvine, CA 92618 |

## 18. Force Majeure.

In the event that it becomes impossible for one Party to perform its obligations under this Agreement or to enjoy the benefits of this Agreement due to strike or insurrection war, riot, explosion, or nuclear incident; or fire, flood, earthquake, or other natural disaster, then that Party shall immediately give notice to the other Party and take reasonable and expedient action to resume performance. Upon receipt of such notice, performance under this Agreement shall immediately be suspended, and neither Party shall be liable for nonperformance or delay for as long as such circumstances prevail and the Party continues to use its best efforts to recommence performance.

## 19. Term and Termination. This Agreement shall commence on the Agreement Effective Date and shall remain in effect until terminated in accordance with this Section 19.

19.1 Grounds for termination. In the event that either Party is in default of a material obligation, which default remains uncured more than 30 days after receipt of written notice of default, the nondefaulting Party, in addition to any other rights available to it under law or equity, may terminate this Agreement by giving written notice to the defaulting Party. Notwithstanding the foregoing, once Licensee has paid in full the agreed license fee for a particular Software Product, the licensing rights granted hereunder shall not terminate as to that Software Product, unless Licensee has breached Section 2 or Section 14, or unless the parties mutually agree to terminate the license. Furthermore, Quest may not terminate any license granted under this Agreement due to nonpayment if Licensee (i) reasonably and in good faith disputes the amount that Quest asserts is due; and (ii) pays

all amounts that are not reasonably in dispute. In the event that the disputed amount exceeds $1 million, Licensee shall deposit the entire disputed amount into an interest-bearing escrow account and maintain such deposit until resolution of the dispute, during which period Quest shall continue to perform Services, and both Parties agree to otherwise comply with this Agreement.

19.2 Return of Property. Upon termination of this Agreement, each Party shall return to the other Party all proprietary documents and materials of the other Party then in its possession. Upon termination of a license as to a particular Software Product, Licensee shall de-install that product and certify in writing within 30 days of such termination that all copies of that product have been destroyed or returned to Quest.

19.3 Survival. The rights and obligations of the Parties pursuant to Sections 7, 10, 14, 15, 16, 19, 21, 22, and any other provision of this Agreement to the extent that provision creates an indemnity obligation, or provides for rights or remedies after termination, shall survive the termination of this Agreement for any reason.

## 20. Assignment.

Neither Party may subcontract, assign its rights or delegate or its duties under this Agreement without the prior written consent of the other Party.

## 21. Legal Actions

21.1 Choice of Law. This Agreement will be interpreted under, and any disputes arising out of this Agreement will be governed by, the patent, trademark, and copyright laws of the United States (where applicable) and the laws of the State of Oregon. THE UNITED NATIONS CONVENTION ON CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS SHALL NOT APPLY.

21.2 Forum Selection. All actions arising out of or in connection with this Agreement shall be brought in the state and federal courts located in the state of Oregon, USA, and both parties irrevocably consent to the exclusive jurisdiction of such courts.

## 22. Miscellaneous.

22.1 Entire Agreement. The Recitals and the Exhibits attached hereto are hereby incorporated into and form a part of this Agreement. This Agreement, along with any Software Orders the Parties may execute, constitutes the entire agreement between Licensee and Quest, with respect to the subject matter of this Agreement, superseding all drafts, all prior or contemporaneous agreements, and all promises or representations, written or oral. Neither Party is relying upon any representations or promises other than those set forth herein.

22.2 Waiver. The nonenforcement of any provision of this Agreement, or failure to insist on strict compliance with any of the terms, covenants or conditions hereof, shall not be deemed a waiver of any right granted under this Agreement; nor shall any waiver of any right granted hereunder on one occasion be deemed a waiver at any other time.

Software License and Service Agreement (dated 11/1/2001) Quest Software, Inc./NIKE, Inc.

22.3 Modification. This Agreement may be modified only by written instrument which states the Parties' intent to amend, expressly refers to the provision(s) of this Agreement to be amended, provides the full text of the amendment, and is countersigned by an authorized representative of both Licensee and Quest. Any "shrink-wrap" agreement, invoice, or other standard form which purports to govern acquisition of products shall be ineffective to modify this Agreement unless so signed or countersigned.

22.4 Advice of Counsel. Each Party to this Agreement consulted with, or had the opportunity to consult with, its legal department or with the independent attorney of its choice with regard to the Agreement, and signs it voluntarily.

22.5 Severability. In the event that any clause of this Agreement is found by a court validly asserting jurisdiction to be invalid or otherwise unenforceable, that clause will be considered void to the extent it is contrary to the applicable law, but such a finding shall not affect the validity of any other clause of the

Agreement, and the rest of the Agreement shall remain in full force and effect.

22.6 Captions. The section captions in this Agreement are for convenience of reference only, and shall not affect the interpretation of the body of the contract.

22.7 Execution by Counterparts. This Agreement may be executed by facsimile and in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.

22. 8 Throughout the term of this Agreement, Quest shall include and insert the following language above the signature lines of each and every Order Form: "This order is subject to the provisions, terms, and conditions of the 'Software License and Service Agreement (dated November 1, 2001)' between NIKE, Inc. and Quest Software, Inc. (the 'Agreement') and hereby incorporates by this reference all of the provisions, terms, and conditions of the Agreement. In the event of conflict, the provisions, terms, and conditions of the Agreement shall prevail over those of this Order Form.

*In WITNESS WHEREOF,*

The Parties have caused this Software License and Service Agreement to be executed and each individual whose signature appears below hereby warrants that he/she is duly authorized to execute this Agreement on behalf of the Party he/she represents.

NIKE, Inc.

By: _[signature]_

Printed Name: Gordon Steele

Title: Chief Information Officer

Date: November 12, 2001

Quest Software, Inc.

By: _[signature]_

Printed Name: Kevin E. Brooks

Title: Corporate Controller

Date: 11/19/01

Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

Page 8 of 8

Exhibit A - Nike Answer/Counterclaims
Page 8 of 25

# Quotation


**QUEST SOFTWARE**

| For | NIKE INC<br>BEAVERTON_2 | | Date | 10/30/2001 | | |
|---|---|---|---|---|---|---|
| | | | **Quote #** | 1-J34M | **Rev #** | 1 |
| | Scott Nasmyth<br>Phone # (503) 532-2224 | | **Effective From** | 10/30/2001 | **Through** | 11/29/2001 |
| | scott.nasmyth@nike.com | | **Sales Rep:**<br>**Phone #** | Greg Lockett<br>(206) 281-1636 | **Fax #** | |

| Bill To | Ship To | End User |
|---|---|---|
| NIKE INC<br>BEAVERTON_2<br>Scott Nasmyth<br>1 SW Bowerman Dr<br>BEAVERTON, OR 97005-6453<br>United States | NIKE INC<br>BEAVERTON_2<br>Scott Nasmyth<br>1 SW Bowerman Dr<br>BEAVERTON, OR 97005-6453<br>United States | NIKE INC<br>BEAVERTON_2<br>Scott Nasmyth<br>1 SW Bowerman Dr<br>BEAVERTON, OR 97005-6453<br>United States<br>scott.nasmyth@nike.com |

| Line | Part # | Product | Qty. | Unit Price | | | Extended Price |
|---|---|---|---|---|---|---|---|
| 1 | UNX-LIV-PB-TRF | LIVE-REORG FOR UNIX SERVER TIER F | 2 | $210,000.00  Disc %: 54.2% | | Net Price: $96,180.00 | $192,360.00 |
| 2 | JUM-LIV-CO | LIVE-REORG JUMPSTART SERVICES | 2 | $8,000.00  Disc %: 54.2% | | Net Price: $3,664.00 | $7,328.00 |

**Payment Terms:** Net 30

| | | |
|---|---|---|
| **Subtotal** | | $199,688.00 |
| **Tax** | | TBD |
| **Total** (before taxes) | | $199,688.00 |

The provisions, terms, and conditions set forth below the signature lines of this order are hereby incorporated into this order.

| **Accepted by NIKE INC** | | **Accepted By Quest Software, Inc.** | |
|---|---|---|---|
| Authorized Signature: | *Gordon Chad* | Authorized Signature: | *Kevin E Brooks* |
| Printed Name: | GORDON STEELL | Printed Name: | Kevin E. Brooks |
| Title: | CIO | Title: | Corporate / Controller |
| Date | 11-12-01 | Date | 11/19/01 |
| PO# | **278241** | | |

This order is subject to the provisions, terms and conditions of the Software License and Service Agreement (dated November 1, 2001) between NIKE, Inc. and Quest Software, Inc. (the "Agreement") and hereby incorporates by this reference all of the provisions, terms and conditions of the Agreement. In the event of conflict, the provisions, terms, and conditions of the Agreement shall prevail over those of this Order Form.

This order is Exhibit A-1 to the Agreement and is an 'Order Form' within the meaning of the Agreement.

Quest will deliver the Licensed Software in CD form and Documentation in hard copy to NIKE within approximately 7 days of the date this Order Form is signed by NIKE. Quest will deliver the applicable permanent activation keys for the Licensed Software to NIKE within approximately 7 days of the date that NIKE requests those keys from Quest.

Jumpstart Services are defined as:
-Technical assistance for Nike in the installation of LiveReorg into a production environment.
-Basic advisory services and knowledge transfer on reorganization methodologies, including "best practices" recommendations.
-Sample live reorganizations.  The database instance involved in reorganization activities will be monitored jointly with Nike to ensure beneficial knowledge transfer to Nike's personnel.
-This includes a minimum of two days of onsite professional services, travel and expenses are included in the price, at a time that is mutually agreeable to both parties.

# Quotation



| For | NIKE INC<br>BEAVERTON_2 | | Date | 10/30/2001 | | |
|---|---|---|---|---|---|---|
| | | | Quote # | 1-J34M | Rev # | 1 |
| | Scott Nasmyth<br>Phone # (503) 532-2224 | | Effective From | 10/30/2001 | Through | 11/29/2001 |
| | scott.nasmyth@nike.com | | Sales Rep:<br>Phone # | Greg Lockett<br>(206) 281-1636 | Fax # | |

# Exhibit B
## Pricing

This is 'Exhibit B' to the 'Software License and Service Agreement (dated November 1, 2001) between NIKE, Inc. and Quest Software, Inc. (the 'Agreement'). The defined terms in the Agreement shall have the same meanings in this Exhibit.

1.  <u>Definitions</u>. Unless otherwise defined herein, terms that are capitalized in this Exhibit B shall have the meanings set forth below:

1.1 "List Price" means Quest's then-current list price at the time of the purchase of a particular Software Product license <u>or</u> the list price for that Software Product license as set forth in '*Schedule A, Quest Price Book, dated October, 2001*', whichever is less. Said 'Schedule A', is attached hereto and hereby incorporated into this Exhibit B by this reference. Throughout the term of the Agreement on a quarterly basis, and at Licensee's request, Quest shall provide Licensee with a soft copy of its then-current list prices for all of its Software Products.

1.2 "License Price" means the discounted price to purchase a Software Product license under the Agreement, as calculated below in *Section 2*.

1.3 "Select Products" means the following Quest products and all of the modules within their suites: LiveReorg, SQL Navigator, TOAD, SQL Impact, Schema Manager, Data Manager, Data Factory, and Qdesigner. Individually, each of these products may also be referred to herein as a "Select Product".

1.4 "Total Payments" means the total amount paid by Licensee to Quest and to resellers for Select Products, including license fees and fees for Maintenance Services and other services, over a certain period of time.

## 2.  <u>Discount for Purchases of Software Product Licenses</u>.

2.1 From November 1, 2001 thru December 31, 2003 (twenty-six months), Quest's price to Licensee for Select Products shall be calculated as follows:

   a.) If at the time of the particular license purchase, the Total Payments from November 1, 2001 up to the date of the particular license purchase is less than $521,000, then the price for the particular license purchase shall be List Price less 50%.

   b.) If at the time of the particular license purchase, the Total Payments from November 1, 2001 up to the date of the particular license purchase is at least $521,000 but less than $821,000, then the price for the particular license purchase shall be List Price less 60%.

   c.) If at the time of the particular license purchase, the Total Payments from November 1, 2001 up to the date of the particular license purchase is greater than $821,000, then the price for the particular license purchase shall be List Price less 70%.

2.2 If the Total Payments from November 1, 2001 thru December 31, 2003 is equal to or greater than $821,000, then from January 31, 2004 thru December 31, 2004, Quest's pricing to Licensee for the Select Products shall be List Price less 70%. This same pricing formula of 'List Price less 70%' for Select Products will continue from year-to-year thereafter until January 1st of the first calendar year to follow a calendar year in which Total Payments were less than $500,000.

2.3 Throughout the term of the Agreement, Quest's discounted price to Licensee for Software Products that are not Select Products shall be as mutually negotiated between Quest and Licensee.

## 3.  <u>Pricing for Maintenance Services</u>.

3.1 For the License Price, Quest will also provide the first year of Maintenance Services to Licensee at no additional charge. Said one-year period of Maintenance Services commences on the date of the invoice for the license fees for the particular Licensed Software.

Page 1 of 2

Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

Exhibit A - Nike Answer/Counterclaims
Page 11 of 25

3.2 If Licensee chooses to renew Maintenance Services for any Licensed Software that was purchased on or after the effective date of the Agreement, the price for renewal shall be as follows:

- For the second year of Maintenance Services, the monthly price is 1.25% of the License Price.
- For the third year of Maintenance Services and all years thereafter, Quest may increase the monthly price by no more than five percent (5%) above the preceding year's monthly price for Maintenance Services. However, notwithstanding the preceding, in no event may the monthly price for Maintenance Services exceed 1.67% of the License Price of the particular Licensed Software.
- In order to renew Maintenance Services coverage, Licensee must also reinstate lapsed coverage, if any, by paying all past due Maintenance Services fees for the period of time between the date coverage lapsed and the date of reinstatement. Said past due fees shall be at the same monthly price as the monthly price charged for a renewal under this Section 3.2. For example, if at the time of reinstatement the monthly price to renew maintenance coverage is 1.25% of the License Price, then the monthly reinstatement fee is also 1.25% of the License Price.

3. 3 If Licensee chooses to renew Maintenance Services for any Software Product that was purchased at any time prior to the effective date of the Agreement, the price for renewal shall be as follows:

- For coverage at any time on or after the effective date of the Agreement but before December 31, 2002, the monthly price is 1.25% of what would have been the License Price for the particular Software Product if the Software Product had been purchased on the effective date of the Agreement.
- For coverage at any time in 2003 and in years thereafter, Quest may increase the monthly price by no more than five percent (5%) above the preceding calendar year's monthly price for Maintenance Services. However, notwithstanding the preceding, in no event may the monthly price for Maintenance Services exceed 1.67% of what would have been the License Price for the particular Software Product if the Software Product had been purchased on the effective date of the Agreement.

*※ Main Fee*

- In order to renew Maintenance Services coverage, Licensee must also reinstate lapsed coverage, if any, by paying all past due Maintenance Services fees for the period of time between the date coverage lapsed and the date of reinstatement. Said past due fees shall be at the same monthly price as the monthly price charged for a renewal under this Section 3.3. For example, if at the time of reinstatement the monthly price to renew maintenance coverage is 1.25% of what would have been the License Price for the particular Software Product if the Software Product had been purchased on the effective date of the Agreement, then the monthly reinstatement fee is the same amount.

4. With the purchase of every LiveReorg license and at no additional charge to Licensee, Quest shall also provide Licensee with one standby license (only to be used in the event of a failover or down production system) and one test/development license.

Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

# Quest Price Book

QSIPB 0701 Quest Software Internal Confidential **I/Watch™**
Prices in US dollars - Effective 07/01/01

## I/Watch for Oracle *Price*

Tier A $3,000
Tier B $6,000
Tier C $12,000
Tier D $21,600
Tier E $31,200
Tier F $43,200

## I/Watch Jumpstart Services *Price*

I/Watch Jumpstart Services –
*(must be included for every first time North American
I/Watch customer)*

## I/Watch for SQL Server *Price*

Tier A $3,000
Tier B $6,000
Tier C $12,000

## I/Watch for Oracle E-Business Suite *Price*

Tier A $7,200
Tier B $10,800
Tier C $18,000
Tier D $32,400
Tier E $46,800
Tier F $62,400

## Notes:

1. All prices include license fee and standard first year maintenance.
2. 24x7 Severity Level 1 Support is available for an additional 5% of list price.
3. I/Watch supports both Oracle and SQL Server but NOT Linux.
4. I/Watch for Oracle E-Business Suite quote must include all servers (database and application) that the software sits on. It includes the I/Watch base cartridge.


## Foglight®

Prices in US dollars - Effective 07/01/01

## Foglight (Sun Solaris only) *Price*

**Foglight Management Server**
(One base fee per customer)
$40,000

## Foglight Base Cartridge* (see note 3) *Price*

Tier A $750
Tier B $1,800
Tier C $3,600

Page 1 of 13

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

Exhibit A - Nike Answer/Counterclaims
Page 13 of 25

Tier D $6,300
Tier E $10,800
Tier F $15,000

## Foglight Database Cartridge* (see note 4)
(available for Oracle, Sybase and SQL Server)
*Price*
Tier A $960
Tier B $1,920
Tier C $4,200
Tier D $7,200
Tier E $11,880
Tier F $17,280

## Foglight Cartridge for Peoplesoft* (see note 4) *Price*
Tier A $5,000
Tier B $7,500
Tier C $10,000
Tier D $17,500
Tier E $26,250
Tier F $37,500

**Foglight (continued)**
Prices in US dollars - Effective 07/01/01

## Foglight Cartridge for mySAP.com* (see note 4) *Price*
Tier A $7,500
Tier B $10,000
Tier C $15,000
Tier D $21,000
Tier E $31,500
Tier F $56,250

## Foglight Cartridge for Siebel eBusiness*
(see note 4)
*Price*
Tier A $7,500
Tier B $10,000
Tier C $15,000
Tier D $21,000
Tier E $31,500
Tier F $56,250

## Foglight Cartridge for WebLogic* (see note 4) *Price*
Tier A $960
Tier B $1,920
Tier C $4,200
Tier D $7,200
Tier E $8,500
Tier F $10,000

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

## Foglight Cartridge for ARTM* (see note 4)
(Active Response Time Management)
### Price
Base $5,000
*see IQ for latest version and supported platforms
### Notes :
1. All prices include license fee and standard first year maintenance.
2. 24x7 Severity Level 1 Support is also available for this product for an additional 5% of list price.
3. Base Cartridge needs to be licensed on all managed servers.
4. Database and Application cartridges do NOT include the Base cartridge.

## Funnel Web®
Prices in US dollars - Effective 07/01/01
## Funnel Web Price
**Funnel Web 4.0 * $495**
**FunnelWeb Enterprise * $2,495**
**Funnel Web Pro 3.7 ***
(electronic download only) $2,495
**Funnel Web Pro 3.7 for Solaris**
(electronic download only) $2,495
**Additional Server license**
(for Enterprise or Pro versions only) $1,495
**Cluster License**
(for Enterprise and Pro versions only) $1,495
**Upgrade FW 3.7 to FW Analyzer 4.0**
(electronic download only) $195
**Upgrade FW Pro 3.7 to FW Analyzer Enterprise 4.0**
(electronic download only) $0
**Funnel Web Profiler – Professional**
(electronic download only; seat-based licensing) $595
* available for Macintosh, Windows 95/98/2000/NT
** available for Linux and FreeBSD
### Notes :
1. All prices include license fee and standard first year maintenance.
2. 24x7 Severity Level 1 Support is not available for this product.
3. Upgrades are electronic download only via the Quest website.
4. If customer purchased upgrade, then the maintenance due will be based on the new edition purchased and not the upgrade price.

QSIPB 0701 Quest Software Internal Confidential **LiveReorg®**
Prices in US dollars - Effective 07/01/01
## LiveReorg for UNIX
*(Professional Services are now required for all first time LiveReorg customers in North America)*
### Price
Tier A $26,750

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

Tier B $45,500
Tier C $83,000
Tier D $128,000
Tier E $165,500
Tier F $218,000
1. 24 x 7 Severity Level 1 support is mandatory for LiveReorg and is included in the first year's license fee. Support renewal will be 25% of purchase price for subsequent years.
2. Where Professional Services are involved in a LiveReorg deal, a LiveReorg "Statement of Work" must be included with the sales order.

# QDesigner™
Prices in US dollars - Effective 07/01/01
## QDesigner *Price License Maint.*
**PhysicalArchitect** $1,300 $1,000 $300
**DataArchitect** $3,900 $3,000 $900
**Developer** $3,900 $3,000 $900
**ObjectArchitect** $6,500 $5,000 $1,500
**PhysicalArchitect with MetaWorks** $3,900 $3,000 $900
**DataArchitect with MetaWorks** $6,500 $5,000 $1,500
**Developer with MetaWorks** $6,500 $5,000 $1,500
**ObjectArchitect with MetaWorks** $9,100 $7,000 $2,100
**MetaWorks** (repository) $2,600 $2,000 $600
## QDesigner Documentation *Price*
**QDesigner PhysicalArchitect User's Guide** Media/Manual $79
**QDesigner DataArchitect User's Guide** Media/Manual $79
**QDesigner ObjectArchitect User's Guide** Media/Manual $119
**QDesigner Developer User's Guide** Media/Manual $79
**QDesigner MetaWorks User's Guide** Media/Manual $49
**Notes:**
1. All prices include license fee and standard first year maintenance.
2. 24x7 Severity Level 1 Support is not available for this product

# QMaster®
Prices in US dollars - Effective 07/01/01
## QMaster Base Product *Price*
**QMaster Master Output Server –** ("MOS") (includes 10 Admin GUIs, Alternate destination delivery, 1 Probing module) $25,000
**QMaster Output Server Agent (JME)** $6,000
**Printer Paths** (by number of printers per Master Output Server)
1 - 10, per printer $360
11 - 50, per printer $120
51 - 100, per printer $84
101 - 250, per printer $60
251 - 500, per printer $48

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

501 +, per printer $36

## QMaster Server Options *Price*

**Document Parsing / Bursting** (per MOS) (file interrogation and splitting of document for bursting distribution) $21,500

**Document Bundling** (per MOS) (for merging of multiple datastreams into a single job) $12,000

**Printer Clustering** (per manufacturer for up to 10 printers) (includes 1 Clustering module, 1 Probing module, 10 PC Agents) $6,000

**Printer Probing** (per manufacturer for SNMP and other types that do not support SNMP i.e. Cannon, Tecktronics, Lantronics and QMS) $6,000

**Chargeback Accounting Module** (per MOS) Costing, tracking and reporting into export facility $12,000

**Alert Notification** (per MOS for up to 10 users plus integration script) Propagates console forward messages to operator/user desktop $9,000

**User Security** (per MOS) Restriction of specific users/groups to specific devices, hosts, queues and at specific times $12,000

**Backup / Failover or Development Master Output Server** Includes basic server only - Professional Services for integration provided at an additional fee $12,000

**SDK API** (per operating system) (For integration to third party applications) $2,500

**QMaster Interface for Unicenter TNG** (per installation) $12,000

**QMaster Interface for SAP R/3** (per installation) $ 30,000

**QMaster Web Client** (per MOS) $10,000

## Quest Central™ for DB2/UDB (Windows, UNIX and OS/2)

Prices in US dollars - Effective 07/01/01

### Quest Central™ for DB2/UDB

*includes Monitoring, Space Management, SQL Tuning & Database Admin. Components*

*Price*

Tier A $11,900

Tier B $20,000

Tier C $36,700

Tier D $64,800

Tier E $97,200

Tier F $135,000

### Performance Monitoring for DB2/UDB *Price*

Tier A $3,600

Tier B $6,000

Tier C $12,000

Tier D $24,000

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

Tier E $36,000
Tier F $48,000

## Space Management for DB2/UDB *Price*

Tier A $2,400
Tier B $4,800
Tier C $8,400
Tier D $14,400
Tier E $21,600
Tier F $30,000

## SQL Tuning for DB2/UDB *Price*

Tier A $4,800
Tier B $7,200
Tier C $14,400
Tier D $24,000
Tier E $36,000
Tier F $48,000

## Database Administration for DB2/UDB *Price*

Tier A $2,400
Tier B $4,200
Tier C $6,000
Tier D $9,600
Tier E $14,400
**Notes:** Tier F $24,000
1. All prices include license fee and standard first year maintenance.
2. 24x7 Severity Level 1 Support is also available for an additional 5% of list price.
3. Components may be purchased individually; Quest Central interface included.

### Quest Central™ for DB2/UDB (Windows, UNIX and OS/2)
Prices in US dollars - Effective 07/01/01

## SQL Tuning for DB2/UDB OS/390 module *Price per MIP*

1 – 260 MIPS $250
261 – 663 MIPS $200
664 – 1821 MIPS $175

### RevealNet™ (complimentary to TOAD/SQL Navigator)
Prices in US dollars - Effective 07/01/01

## RevealNet *Price License Maint.*

**Knowledge Base for Active PL/SQL**
**Development** $295 $225 $70
**Knowledge Base for Oracle Administration** $395 $300 $95
**Formatter Plus** $200 $150 $50
**Upgrade from PL/Formatter to Formatter Plus** $75 $75 $0
**PL/Generator** $670 $495 $175

Page 6 of 13

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

**Line # # of Seats Max Discount**
Line 1 1 - 4 0%
Line 2 5 - 9 7%
Line 3 10 - 25 13%
Line 4 26 - 50 16%
Line 5 51 - 75 20%
Line 6 76 - 100 22%
Line 7 101 - 150 27%
Line 8 151 - 250 33%
Line 9 251 - 500 40%
Line 10 501 - 750 45%
Line 11 751 + 50%
**Notes:**
1. All prices include license fee and standard first year maintenance.
2. 24x7 Severity Level 1 Support is not available for this product option.

## Schema Manager™
Prices in US dollars - Effective 07/01/01
## Schema Manager for Oracle *Price*
Tier A $2,160
Tier B $4,320
Tier C $8,640
Tier D $15,300
Tier E $21,600
Tier F $27,000
## Data Manager with Schema Manager *Price*
Tier A $3,780
Tier B $7,560
Tier C $15,120
Tier D $26,770
Tier E $37,800
Tier F $47,260
**Notes:**
1. All prices include license fee and standard first year maintenance.
2. 24x7 Severity Level 1 Support is not available for these products.

## SharePlex® for Oracle®
Prices in US dollars - Effective 07/01/01
## SharePack (See note 5 & 6) *Price*
Tier A $52,090
Tier B $76,800
Tier C $104,470
Tier D $161,840
Tier E $221,620
Tier F $278,500

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

## SharePlex for Oracle (See note 7) *Price*

Tier A $43,125
Tier B $64,685
Tier C $86,250
Tier D $129,375
Tier E $172,500
Tier F $215,625

**Notes:**

1. All prices include license fee and 24x7 Severity Level 1 first year maintenance. Support renewal will be 25% of purchase price for subsequent years.
2. Professional services must be scoped on every order and a statement of work completed.
3. 3-day SharePlex training class in Irvine is $1500 per person.
4. Client is responsible for all travel expenses.
5. **SharePack** includes SharePlex for Oracle with Overdrive and 1 server of each of the following products: Schema Manager, SQLab Vision, Space Manager with FastCopy & Spotlight on Oracle.
6. **SharePack** includes a built-in discount of 15-25%, based upon tier – no additional discounting.
7. Shareplex for Oracle includes the use of **Overdrive**, the Reconcile Post feature.

## SharePlex® FS

Prices in US dollars - Effective 07/01/01

### SharePlex FS *Price*

Tier A $10,000
Tier B $20,000
Tier C $30,000
Tier D $45,000
Tier E $60,000
Tier F $75,000

### SharePlex FS Test Server (see note 2)

*(25% of list SharePlex FS Tier Price)*

*Price*

Tier A $2,500
Tier B $5,000
Tier C $7,500
Tier D $11,250
Tier E $15,000
Tier F $18,750

### SharePlex FS Non-Production (see note 3)

*(35% of list SharePlex FS Tier Price)*

*Price*

Tier A $3,500
Tier B $7,000
Tier C $10,500
Tier D $15,750

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

Tier E $21,000
Tier F $26,250
**Notes:**
1. All prices include license fee and 24x7 Severity Level 1 first year maintenance. Support renewal will be 25% of purchase price for subsequent years.
2. **Test Server license** - for servers used in training, testing, development, or pre-production environments only
3. **Non-Production** - for servers used in production cluster environments; software will only be used during failure (non-operation) of a source Production server and during occasional disaster recovery testing
4. Supports HP UX version 10.20 and above and Sun Solaris version 2.6 and above; also supports UFS and vXFS on Sun.

## Space Manager™
Prices in US dollars - Effective 07/01/01
### Space Manager for Oracle *Price*
Tier A $3,600
Tier B $7,200
Tier C $14,400
Tier D $25,200
Tier E $36,000
Tier F $45,000
**Notes:**
1. All prices include license fee and standard first year maintenance.
2. 24x7 Severity Level 1 Support is also available for an additional 5% of list price.

## Spotlight™
Prices in US dollars - Effective 07/01/01
### Spotlight on Oracle *Price*
Tier A $2,400
Tier B $4,800
Tier C $8,400
Tier D $14,400
Tier E $21,600
Tier F $28,800
### Spotlight on SQL Server
**for NT / 2000 / Linux** (see note 3)
*Price*
Tier A $1,195
Tier B $2,395
Tier C $4,795
### Spotlight on Exchange *Price*
Tier A $1,195
Tier B $2,395
Tier C $4,795

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

## Spotlight on Windows
### for NT 4.0 / 2000
*Price*

Tier A $395
Tier B $995
Tier C $2,495

## Spotlight on Active Directory *Price*

1 CPU $1,495
2 Processor $2,595
3 Processor $3,295
4+ Processor $3,695

## Spotlight on Web Servers * *Price*

First Server $1,495
Each additional server $995
*For (IIS 4.0 / NES 3.62 / iPlanet 4.0) on Windows NT 4
For (IIS 5.0 / NES 3.62 / iPlanet 4.0) on Windows 2000
For (Apache 1.3) on RedHat Linux 6.2
For (NES 3.62 / iPlanet 4.0) on Sun Solaris 2.6+

## Spotlight™ (continued)
Prices in US dollars - Effective 07/01/01
## Spotlight on EMC Symmetrix
(determined by raw storage capacity in
terabytes; add up each server's capacity for
total price)
*Price*
(per Symmetrix
system)
Up to 2 terabytes $3,000
2 terabytes to 6 terabytes $5,000
Greater than 6 terabytes $7,000

## Spotlight on Oracle E-Business Suite
(formerly Spotlight on Oracle Applications -
see notes 5 & 6)
*Price*
Tier A $5,760
Tier B $8,640
Tier C $12,600
Tier D $21,600
Tier E $32,400
Tier F $41,600

## Notes:
All prices include license fee and standard first year maintenance.
For Spotlight for SQL Server a license must be purchased for every node in a
cluster.
Pricing for Spotlight on Oracle E-Business Suite **does not** include Spotlight on

Page 10 of 13

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

Exhibit A - Nike Answer/Counterclaims
Page 22 of 25

Oracle base product.
Spotlight on Oracle is not required to run Spotlight on Oracle E-Business Suite but is recommended.
Spotlight on Oracle E-Business Suite quote should include all the servers (database and application) that the Oracle E-Business software sits on.


# SQLab Vision™
Prices in US dollars - Effective 07/01/01
## SQLab Vision *(includes SQLab Xpert, SQL Impact and StealthCollect (Recon))*
*Price*
Tier A $10,000
Tier B $15,000
Tier C $24,000
Tier D $31,500
Tier E $43,000
Tier F $54,000
## SQLab Xpert to SQLab Vision Upgrade *Price*
Tier A $3,500
Tier B $3,500
Tier C $5,250
Tier D $6,300
Tier E $8,400
Tier F $10,500
## SQLab Tuner to SQLab Vision Upgrade *Price*
Tier A $4,200
Tier B $5,460
Tier C $8,400
Tier D $10,290
Tier E $13,300
Tier F $16,800
## Notes:
All prices include license fee and standard first year maintenance.
24x7 Severity Level 1 Support is not available for this product.
SQLab Xpert/Tuner (instance based licenses) upgrade to SQLab Vision –
Credit the customer for what they have, at list price and charge them the difference to the SQLab Vision list price. This will replace their existing licenses.


# SQLab Xpert®
Prices in US dollars - Effective 07/01/01
## SQLab Xpert™ for Oracle *Price*
Tier A $6,000
Tier B $12,000
Tier C $19,200
Tier D $25,200

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

Tier E $36,000
Tier F $45,000

## SQL Impact™
Prices in US dollars - Effective 07/01/01
## SQL Impact *Price*
**SQL Impact Server**
(Unlimited users – all languages)
$9,000
**SQL Impact Seat** (single server) $1,350
## SQL Impact to SQLab Vision Upgrade *Price*
Tier A $1,750
Tier B $2,450
Tier C $8,400
Tier D $13,650
Tier E $21,700
Tier F $29,400
**Notes:**
1. SQL Impact Server includes support for all available languages
2. SQL Impact Server includes unlimited registration and viewing seats
3. Customer must purchase a server license for any server against which they want to run the impact analysis
4. 24x7 Severity Level 1 Support is not available for this product
5. All prices include license fee and standard first year maintenance.
6. Supported languages include the following:

## SQL Navigator™
Prices in US dollars - Effective 07/01/01
## SQL Navigator Bundles *Price*
**SQL Navigator - Standard Edition** $795
*(includes 1 seat of SQL Navigator with PL/Formatter)*
**SQL Navigator – Professional Edition** $1,325
*(includes 1 seat of SQL Navigator with Debugger and Formatter Plus)*
**SQL Navigator – Xpert Edition** $1,980
*(includes 1 seat of SQL Navigator with Debugger, Xpert option and Formatter Plus)*

## SQL Navigator for Oracle *Price License Maint.*
**SQL Navigator** (Base Product)  $670      $495      $175
**Debugger** $520 $395 $125
**Xpert Tuning module** (SQLab Xpert client) $1,350 $1,000 $350
**SQLab Tuner option upgrade to SQLab Xpert option** (See Note 4) $250 $250 $0
**DataFactory** (formerly TestBase)
(Standalone product – SQL Nav not required) $590 $495 $95
**PL/Formatter** $125 $95 $30

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

## StorageXpert™
Prices in US dollars - Effective 07/01/01
## StorageXpert™ for Oracle
(Pricing based on configured space per server)
*Price*
0 – 255 GB $20,000
257 - 512 GB $36,000
513 - 1024 GB $64,000
1025 - 4096 GB $104,000


## TOAD®
Prices in US dollars - Effective 07/01/01
### TOAD Bundles TOAD – Standard Edition $795
*(includes 1 seat of TOAD with PL/Formatter)*
### TOAD Developer – Professional Edition $1,325
*(includes 1 seat of TOAD with Debugger and Formatter Plus)*
### TOAD Developer – Xpert Edition $1,980
*(includes 1 seat of TOAD with Debugger, Xpert option and Formatter Plus)*


### TOAD *Price License Maint.*
**TOAD** (Base Product) $670 $495 $175
**Debugger** $520 $395 $125
**Xpert Tuning module** (SQLab Xpert client) $1,350 $1,000 $350
**SQLab Tuner option upgrade to SQLab Xpert**
**option** (see note 4)
$250 $250 $0
**DataFactory** (formerly TestBase)
(standalone product – TOAD not required)
$590 $495 $95
**PL/Formatter** $125 $95 $30
**Notes:**

Schedule A, Quest Price Book, dated October, 2001
Exhibit B, Pricing
Software License and Service Agreement (dated 11/1/2001)
Quest Software, Inc./NIKE, Inc.

# Exhibit B



**Quest Software, Inc.**                                    Agreement Number: US-MPA-12-0008
*Master Product Agreement*

This Master Product Agreement (the "**Agreement**") is made between Quest Software, Inc. with its principal place of business located at 5 Polaris Way, Aliso Viejo, California, 92656 ("**Quest**") and World Fuel Services Corporation, with its principal place of business located at 9800 NW 41st Street, Suite 400, Miami, FL 33178 ("**Customer**").

1.  **Definitions.**   Capitalized terms not defined in context shall have the meanings assigned to them below:

(a)   "**Affiliate**" means any legal entity controlling, controlled by, or under common control with a party to this Agreement, for so long as such control relationship exists.

(b)   "**Documentation**" means the user manuals and documentation that Quest delivers with the Software, and all copies of the foregoing.

(c)   "**Hardware**" means the hardware products purchased by Customer under this Agreement.

(d)   "**License Type**" means the model by which the Software is licensed (e.g., by server, by mailbox, by managed user) as indicated in the applicable Order.

(e)   "**Partner**" means a reseller or distributor that is under contract with Quest or another Partner and is authorized via the contract to resell the Products and/or Maintenance Services.

(f)   "**Product Guide**" means the document located at http://www.quest.com/productguide that contains the Product Terms.

(g)   "**Product Terms**" means the usage rights and other terms associated with each License Type or individual Product.

(h)   "**Products**" means the Software and/or Hardware purchased by Customer under this Agreement.

(i)   "**Schedule**" means a document, such as a Quest Quotation, that is executed by the parties or their respective Affiliates in connection with an Order.

(j)   "**Software**" means the object code version of the software that is delivered pursuant to an Order as well as any corrections, enhancements, and upgrades to such software that Quest may provide to Customer pursuant to this Agreement, and all copies of the foregoing.

2.  **Ordering.**

(a)   Customer and its Affiliates may order Products and Maintenance Services under this Agreement by either (a) issuing a purchase order ("PO") to Quest, a Quest Affiliate, or a Partner or (b) by executing a Schedule with Quest or a Quest Affiliate (each Schedule or PO shall be an "**Order**").   Each Order shall include (i) a description, unit price, and quantity for each Product and/or Maintenance Service being ordered, and (ii) for Software, the License Type, License duration (if other than perpetual), and an express indication if the Software is to be used for MSP purposes. If the Software is to be used for MSP purposes, the Order shall also include the name of the MSP Client.   Each Order shall be the ordering party's irrevocable commitment to purchase and pay for the Products and/or Maintenance Services stated in the Order and, except for POs to Partners, shall be subject to approval by Quest either in writing or by shipment ("**Approve**" or "**Approved**").

(b)   If an Order is placed by an Affiliate of Customer, such Affiliate agrees to be bound by the terms of this Agreement and shall be considered the "Customer" as that term is used herein.  If an Order is issued to and Approved by a Quest Affiliate, such Affiliate agrees to be bound by the terms of this Agreement and shall be considered "Quest" as that term is used herein.

(c)   Customer and Quest agree that (i) Orders issued by Customer to Quest shall be governed solely by the terms of this Agreement and the applicable Schedule (if any), and (ii) Orders placed through a Partner shall be governed solely by the terms of this Agreement. Any conflicting or additional terms in or accompanying an Order (including but not limited to terms on Customer's POs) will not be binding on Quest unless Quest accepts such terms in writing.  For the avoidance of doubt, pricing and payment terms for Orders placed through a Partner shall be as agreed upon between Customer and the Partner.

**M S**

Exhibit B - Nike Answer/Counterclaims
Page 1 of 8

(d)   The Product Terms for each Order shall be as stated in the Product Guide as of the date of the Order unless Product Terms are stated in the applicable Schedule (if any).    For the avoidance of doubt, Product Terms that conflict with the Product Guide and any future pricing commitments that are agreed upon by the parties must be stated in a Schedule signed by Quest and Customer.

3.    **Software License.**

(a)   **Internal Use License.** Subject to the terms of this Agreement, Quest grants to Customer, and Customer accepts from Quest, a perpetual (unless otherwise set forth in an Order), non-exclusive, non-transferable (except as otherwise set forth herein) and non-sublicensable license to (i) install, execute, access, run, or otherwise use the quantities of each item of Software identified in the applicable Order within the parameters of the Product Terms associated with the applicable Product and License Type, (ii) make a reasonable number of additional copies of the Software to be used solely for non-productive archival or passive disaster recovery purposes, provided such copies are kept in a secure location and are not used for production purposes unless the primary copy of the Software is not being used for production purposes, and (iii) make and use copies of the Documentation as reasonably necessary to support Customer's authorized users in their use of the Software (collectively, **"License"**). Each License shall only be used by Customer in the country in which the Software is initially delivered to Customer. Except for MSP Licenses (as defined below), Customer shall only use the Software to support the internal business operations of itself and its worldwide Affiliates.

(b)   **MSP License.** If an MSP License is specifically identified in an Order, Customer shall be granted a License to use the Software identified in the Order and the associated Documentation as a managed service provider (**"MSP"**) to provide software and systems management services, including, without limitation, application, operating system, and database implementation, performance tuning, and maintenance services (**"Management Services"**), for the benefit of the single named client stated in the Order (**"Client"**), pursuant to the terms of this Agreement and the MSP Use Terms in the Product Guide.

(c)   **Evaluation License.** If an Order indicates that Software is to be used for evaluation purposes, or if the Software is otherwise obtained from Quest for evaluation purposes, Customer shall be granted a non-production License to use the Software identified in the Order and the associated Documentation solely for Customer's own internal evaluation purposes for an evaluation period of up to thirty (30) days from the date of delivery of the Software, plus any extensions granted by Quest in writing (the **"Evaluation Period"**). There is no fee for Customer's use of the Software for non-production evaluation purposes during the Evaluation Period, however, Customer is responsible for any applicable shipping charges or taxes which may be incurred, and any fees which may be associated with usage beyond the scope permitted herein. Customer's opportunity for a free evaluation of the Software is limited to one Evaluation Period per release of the Software. Notwithstanding anything otherwise set forth in this Agreement, Customer understands and agrees that evaluation Software is provided "AS IS" and that Quest does not provide a Warranty or Maintenance Services for evaluation Licenses.

(d)   **Third Party Use.** If Customer contracts with a third party who performs Software implementation, configuration, consulting or outsourcing services (**"Service Provider"**), the Service Provider may use the Software and Documentation Licensed by Customer hereunder solely for purposes of providing such services to Customer, provided that (i) Customer ensures that the Service Provider uses the Software and Documentation in accordance with the terms of this Agreement, (ii) the use of the Software and Documentation by the Service Provider will not violate the terms of the export restrictions set forth herein, and (iii) the Service Provider is not a Quest competitor. Customer shall be jointly and severally liable to Quest for the acts and omissions of its Service Providers in connection with their permitted use of the Software and Documentation.

(e)   **Freeware.** If a freeware version of Quest software ("Freeware") is downloaded by Customer from a Quest website, the terms of such use shall be governed by the applicable Freeware definition set forth in the Product Guide.

4.    **Restrictions.** Except to the extent expressly permitted by applicable law, and to the extent that Quest is not permitted by that applicable law to exclude or limit the following rights, Customer may not reverse engineer, decompile, disassemble, or attempt to discover or modify in any way the underlying source code of the Products, Documentation or any part thereof. In addition, Customer may not (i) modify, translate, localize, adapt, rent, lease, loan, create or prepare derivative works of, or create a patent based on the Products, Documentation or any part thereof, or (ii) resell the Products or Documentation or use the Products or Documentation in any commercial time share arrangement, in connection with the operation of any nuclear facilities, or for purposes which are competitive to Quest. Each permitted copy of the Software and Documentation made by Customer hereunder must contain all titles, trademarks, copyrights and restricted rights notices as in the original. Customer understands and agrees that the Products may work in conjunction with third party products and Customer agrees to be responsible for ensuring that it is properly licensed to use such third party products. Notwithstanding anything otherwise set forth in this Agreement, the terms and restrictions set forth herein shall not prevent or restrict Customer from exercising additional or different rights to any open source software that may be contained in or provided with the Products in accordance with the applicable open source licenses.  Customer may not use any license keys or other license access devices not provided by Quest, including but not limited to "pirate keys", to install or access the Products.

5.    **Reservation of Rights and Ownership.** Quest reserves any and all rights, implied or otherwise, which are not expressly granted to Customer in this Agreement.  Customer understands and agrees that (i) the Products are protected by copyright and other intellectual property laws and treaties, (ii) Quest and/or its suppliers own the title, copyright, and other intellectual property rights in the Products, (iii) the Software is licensed, and not sold, and (iv) this Agreement does not grant Customer any rights to Quest's trademarks or service marks.

**M S**

Quest Legal Dept.
Approved

6.    **Hardware.** In the event Customer acquires Hardware under this Agreement, title to such Hardware shall pass to Customer upon shipment (unless such Hardware is rented, leased or loaned to Customer).

7.    **Payment.** Customer agrees to pay to Quest (or, if applicable, the Partner) the fees specified in each Order, including any applicable shipping fees. Customer will be invoiced promptly following delivery of the Products or prior to the commencement of any Renewal Maintenance Period and Customer shall make all payments due to Quest in full within thirty (30) days from the date of each invoice or such other period (if any) stated in a Schedule. Any amounts payable to Quest by Customer that remain unpaid after the due date shall be subject to a late charge of 1.5% of the invoice amount per month from the due date until such amount is paid, or the maximum rate permitted by law if less.

8.    **Taxes.** The fees stated in an Order may not include taxes. If Quest is required to pay sales, use, property, value-added or other taxes based on the Products or Maintenance Services provided under this Agreement or on Customer's use of Products or Maintenance Services, then such taxes shall be billed to and paid by Customer. This Section does not apply to taxes based on Quest's income.

9.    **Term and Termination.**

(a)    **Term.** The term of this Agreement will begin on the last or only date of the signatures below" (the "**Agreement Date**") and will continue for one (1) year thereafter unless earlier terminated in accordance with the provisions hereof (the "**Initial Term**"). Upon expiration of the Initial Term, this Agreement shall automatically renew for additional terms of one (1) year (each, a "**Renewal Term**") unless one party notifies the other at least thirty (30) days prior to the end of the Initial Term or a Renewal Term of its intent not to renew.

(b)    **Termination.** This Agreement or Licenses granted hereunder may be terminated (i) by mutual agreement of Quest and Customer, (ii) by Quest, if Customer or a Service Provider commits a material breach of this Agreement and fails to cure such breach to Quest's reasonable satisfaction within thirty (30) days following receipt of Quest's notice thereof, or (iii) by Customer for any reason upon thirty (30) days written notice to Quest. Licenses that are not the subject of a particular breach may not be terminated by Quest, but any noncompliance with the "*Restrictions*," "*Nondisclosure*" or "*Usage Verification*" Sections of this Agreement will be considered a material breach of all Licenses.

(c)    **Effect of Expiration or Termination.** In the event a party elects not to renew this Agreement upon the expiration of the Initial Term or a Renewal Term as set forth in Section 9(a), 9(b)(i) or 9(b)(iii),, this Agreement shall expire. Upon expiration of this Agreement, Customer may no longer place, and Quest will no longer Approve Orders under this Agreement; however, the Licenses or Maintenance Services purchased by Customer prior to such expiration will continue in effect and will remain subject to this Agreement until each such License or Maintenance Service expires or is otherwise terminated. Upon termination of this Agreement in accordance with Section 9(b)(ii), or expiration or termination of a License for any reason, all rights granted to Customer for the applicable License(s) shall immediately cease and Customer shall immediately: (i) cease using the applicable Software and Documentation, (ii) remove all copies, installations, and instances of the applicable Software from all Customer computers, (iii) return the applicable Software to Quest together with all Documentation and other materials associated with the Software and all copies of any of the foregoing, or destroy such items, (iv) cease using the Maintenance Services associated with the applicable License(s), (v) pay Quest or the applicable Partner all amounts due and payable up to the date of termination, and (vi) give Quest a written certification that Customer has complied with all of the foregoing obligations. Termination of this Agreement or a License shall be without prejudice to any other remedies that the terminating party may have under law, subject to the limitations and exclusions set forth in this Agreement.

(d)    **Survival.** Any provision of this Agreement that requires or contemplates execution after termination of this Agreement or expiration or termination of a License is enforceable against the other party and their respective successors and assignees notwithstanding termination or expiration, including, without limitation, the "*Payment*," "*Taxes*," "*Effect of Expiration or Termination*," "*Survival*," "*Warranty Disclaimer*," "*Infringement*," "*Restrictions*,"'*Limitation of Liability*," "*Nondisclosure*," "*Usage Verification*," and "*General*" Sections of this Agreement.

10.    **Export.** Customer acknowledges and agrees that the Products are subject to the export control laws, rules, regulations, restrictions and national security controls of the United States and other applicable foreign agencies (the "**Export Controls**"), and agrees not to export or re-export, or allow the export or re-export of the Products or any copy, portion or direct product of the foregoing in violation of the Export Controls. Customer hereby represents that (i) Customer is not an entity or person to which shipment of Products is prohibited by the Export Controls; and (ii) Customer will not export, re-export or otherwise transfer the Products to (a) any country subject to a United States trade embargo, (b) a national or resident of any country subject to a United States trade embargo, (c) any person or entity to which shipment of Products is prohibited by the Export Controls, or (d) anyone who is engaged in activities related to the design, development, production, or use of nuclear materials, nuclear facilities, nuclear weapons, missiles or chemical or biological weapons.

**M S**

**11.   Maintenance.** During any Maintenance Period and for the applicable fees, Quest shall make available to Customer the maintenance and support services for the Software as defined in this Section 11 ("**Maintenance Services**"). The first Maintenance Period begins on the date of delivery of the Software following an Approved Order and ends twelve (12) months thereafter unless otherwise set forth in the applicable Order (the "**Initial Maintenance Period**"). Following the Initial Maintenance Period, Maintenance Services shall automatically renew for additional terms of twelve (12) months (each, a "**Renewal Maintenance Period**") unless the renewal has been cancelled by either party giving written notice to the other at least sixty (60) days prior to the first day of the applicable Renewal Maintenance Period. Cancellation of Maintenance Services will not terminate Customer's rights to continue to use the Software. Maintenance fees shall be due in advance of a Renewal Maintenance Period and shall be subject to the payment requirements set forth in this Agreement. The procedure for reinstating Maintenance Services after it has lapsed is posted at http://support.quest.com/Maintenance_Service.asp.

Except as otherwise stated in the Product Guide, Maintenance Services shall be available via the Internet, e-mail, or telephone and shall mean the following:

(a)   Quest shall make available to Customer new versions and releases of the Software, including Software corrections, enhancements and upgrades, if and when Quest makes them generally available without charge as part of Maintenance Services.
(b)   Quest shall respond to unlimited communications from Customer that report Software failures not previously reported to Quest by Customer. Nothing in the foregoing shall operate to limit or restrict follow up communication by Customer regarding Software failures.

(c)   Quest shall respond to requests from Customer's technical coordinators for assistance with the operational/technical aspects of the Software; provided that Quest shall have the right to limit such responses if Quest determines, in its sole reasonable discretion, that on-site consulting services  would be more appropriate to address the scope and nature of the requests.  Any such onsite consultation would be pursuant to a services agreement as agreed upon by the parties.

(d)   Customer shall have access to Quest's Support Web site at http://support.quest.com ("**SupportLink**").

(e)   Maintenance Services are available during standard support hours ("**Business Hours**") as indicated on SupportLink.  In addition, Customer may purchase Business Critical Support (i.e. 24x7 Severity Level 1 support) for certain Software. The list of Software for which Business Critical Support is available and/or required is set forth on SupportLink.

(f)   During Business Hours, Quest will respond within one (1) hour to a call from Customer which reports a critical Software condition (a "**Severity Level 1 Problem**"). Customer must use commercially reasonable efforts to provide Quest with the necessary remote access to facilitate the identification and resolution of a Severity Level 1 Problem.  Quest's ability to identify and resolve a Severity Level 1 Problem may be delayed without such remote access.

(g)   The Maintenance Services for those Software products that Quest has obtained through an acquisition or merger may, for a period of time following the effective date of the acquisition or merger, be governed by terms other than those in this Section 11. The applicable different terms, if any, shall be stated on SupportLink.

**12. Warranties.**

(a)   **Software Warranty.** Quest warrants that, for a period of thirty (30) days following the initial delivery of Software pursuant to an Approved Order (the "**Warranty Period**"), (i) the media provided by Quest, if any, on which the Software is recorded will be free from material defects in materials and workmanship under normal use, (ii) the operation of the Software, as provided by Quest, will substantially conform to the Documentation applicable to such Software, and (iii) the Software as delivered by Quest does not contain any viruses, worms, Trojan Horses, or other malicious or destructive code designed by Quest to allow unauthorized intrusion upon, disabling of, or erasure of the Software (however, the Software may contain a key limiting use of the Software to within the scope of License granted, and license keys issued by Quest for temporary use are time-sensitive) (the "**Warranties**"). Customer must give written notice to Quest of any breach of the Warranties no later than five days following the expiration of the Warranty Period.

Customer's exclusive remedies, and Quest's sole obligations, for any such breach of these Warranties shall be as follows: (a) for the warranty in subsection (i),  Quest shall, at its expense, replace any defective media; (b) for the warranty in subsection (ii) , Quest shall correct or provide a workaround for reproducible errors in the Software that cause a breach of the warranty within a reasonable time considering the severity of the error and its effect on Customer, or, at Quest's option, refund the license fees paid for the nonconforming Software upon return of such Software to Quest and termination of the related License(s) hereunder; and (c) for the warranty in subsection (iii), Quest shall provide a copy of the Software that is in conformance with such warranty.

The foregoing Warranties shall not apply to any non-conformance (i) that Quest cannot recreate after exercising commercially reasonable efforts to attempt to do so; (ii) caused by misuse of the Software or by using the Software in a manner that is inconsistent with this Agreement or the Documentation: or (iii) arising from the modification of the Software by anyone other than Quest.

(b)   **Hardware Warranty.** Hardware shall be warranted in accordance with the warranty document delivered with the Hardware and/or included on the hardware manufacturers' website. In the event Customer acquires Hardware that is delivered with a third

**M S**

Exhibit B - Nike Answer/Counterclaims
Page 4 of 8

party warranty (**"Third Party Warranty"**). Customer will rely solely on the applicable third party for all Third Party Warranty obligations.

(c) **Warranty Disclaimer.** THE EXPRESS WARRANTIES AND REMEDIES SET FORTH IN THIS SECTION ARE THE ONLY WARRANTIES AND REMEDIES PROVIDED BY QUEST HEREUNDER. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ALL OTHER WARRANTIES OR REMEDIES ARE EXCLUDED, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, NON-INFRINGEMENT, SATISFACTORY QUALITY, AND ANY WARRANTIES ARISING FROM USAGE OF TRADE OR COURSE OF DEALING OR PERFORMANCE. QUEST DOES NOT WARRANT UNINTERRUPTED OR ERROR-FREE OPERATION OF THE PRODUCTS.

**13. Infringement.** Quest will at its own expense defend or settle any claim, suit, action, or proceeding brought against Customer by a third party to the extent it is based on an allegation that the Software directly infringes any patent, copyright, trademark, or other proprietary right enforceable in the country in which the Software is delivered to Customer, or misappropriates a trade secret in such country (a **"Claim"**). Additionally, Quest shall pay any judgments finally awarded against Customer under a Claim or any amounts assessed against Customer in any settlements of a Claim, and reasonable administrative costs or expenses, including without limitation reasonable attorneys' fees, necessarily incurred by Customer in responding to the Claim. Quest's obligations under this Section are conditioned upon Customer (i) giving prompt written notice of the Claim to Quest; (ii) permitting Quest to retain sole control of the investigation, defense or settlement of the Claim, and (iii) providing Quest with such cooperation and assistance as Quest may reasonably request from time to time in connection with the investigation, defense or settlement of the Claim. Quest shall have no obligation hereunder to defend Customer against any Claim (a) resulting from use of the Software other than as authorized in this Agreement, (b) resulting from a modification of the Software other than by Quest, or (c) based on Customer's use of the Software after Quest recommends discontinuation because of possible or actual infringement, (d) based on Customer's use of a superseded or altered release of Software if the infringement would have been avoided by use of a current or unaltered release of the Software made available to Customer, or (e) to the extent the Claim arises from or is based on the use of the Software with other products, services, or data not supplied by Quest if the infringement would not have occurred but for such use. If Customer's use of the Software is enjoined as a result of a Claim, Quest shall, at its expense and option either (i) obtain for Customer the right to continue using the Software, (ii) replace the Software with a functionally equivalent non-infringing product, (iii) modify the Software so that it is non-infringing, or (iv) accept the return of the infringing Software and refund the license fee paid for the infringing Software, pro-rated over a sixty (60) month period from the date of delivery of the Software following an Approved Order. This Section states the entire liability of Quest, and Customer's sole and exclusive remedy, with respect to a Claim.

**14. Limitation of Liability.** EXCEPT FOR (A) ANY BREACH OF THE "*RESTRICTIONS*" OR "*NONDISCLOSURE*" SECTIONS OF THIS AGREEMENT, (B) AMOUNTS CONTAINED IN JUDGMENTS OR SETTLEMENTS WHICH QUEST IS LIABLE TO PAY ON BEHALF OF CUSTOMER UNDER THE "*INFRINGEMENT*" SECTION OF THIS AGREEMENT, OR (C) ANY LIABILITY TO THE EXTENT LIABILITY MAY NOT BE EXCLUDED OR LIMITED AS A MATTER OF LAW, IN NO EVENT SHALL QUEST, ITS AFFILIATES, OR SUPPLIERS, OR CUSTOMER OR ITS AFFILIATES, BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL LOSS OR DAMAGE OF ANY KIND, INCLUDING BUT NOT LIMITED TO LOSS OF REVENUE, LOSS OF ACTUAL OR ANTICIPATED PROFITS, LOSS OF BUSINESS, LOSS OF CONTRACTS, LOSS OF GOODWILL OR REPUTATION, LOSS OF ANTICIPATED SAVINGS, LOSS OF, DAMAGE TO OR CORRUPTION OF DATA, HOWSOEVER ARISING, WHETHER SUCH LOSS OR DAMAGE WAS FORESEEABLE OR IN THE CONTEMPLATION OF THE PARTIES AND WHETHER ARISING IN OR FOR BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), BREACH OF STATUTORY DUTY, OR OTHERWISE.

EXCEPT FOR (A) ANY BREACH OF THE "*SOFTWARE LICENSE*," "*RESTRICTIONS*," "*EXPORT*" OR "*NONDISCLOSURE*" SECTIONS OF THIS AGREEMENT, OR ANY OTHER VIOLATION OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS; (B) QUEST'S EXPRESS OBLIGATIONS UNDER THE "*INFRINGEMENT*" SECTION OF THIS AGREEMENT; (C) QUEST'S COSTS OF COLLECTING DELINQUENT AMOUNTS WHICH ARE NOT THE SUBJECT OF A GOOD FAITH DISPUTE; OR (D) ANY LIABILITY TO THE EXTENT LIABILITY MAY NOT BE EXCLUDED OR LIMITED AS A MATTER OF LAW, THE MAXIMUM AGGREGATE AND CUMULATIVE LIABILITY OF QUEST, ITS AFFILIATES AND SUPPLIERS, AND CUSTOMER AND ITS AFFILIATES UNDER THIS AGREEMENT, WHETHER ARISING IN OR FOR BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), BREACH OF STATUTORY DUTY, OR OTHERWISE, SHALL NOT EXCEED THE FEES PAID AND/OR OWED (AS APPLICABLE) BY CUSTOMER OR ITS AFFILIATES FOR THE PRODUCTS OR MAINTENANCE SERVICES THAT ARE THE SUBJECT OF THE BREACH. FOR MAINTENANCE SERVICES OR A PRODUCT SUBJECT TO RECURRING FEES, THE LIABILITY SHALL NOT EXCEED THE AMOUNT PAID AND/OR OWED (AS APPLICABLE) FOR SUCH MAINTENANCE SERVICE OR PRODUCT DURING THE TWELVE (12) MONTHS PRECEDING THE BREACH.

Quest's Affiliates and suppliers and Customer's Affiliates shall be beneficiaries of this "*Limitation of Liability*" section and Customer's Service Providers are entitled to the rights granted under the "*Third Party Use*" section of this Agreement; otherwise, no third party beneficiaries exist under this Agreement. Quest expressly excludes any and all liability to Customer's Service Providers, Clients and to any other third party.

**15. Nondisclosure. "Confidential Information"** means information or materials disclosed by one party (the "**Disclosing Party**") to the other party (the **"Receiving Party"**) that are not generally available to the public and which, due to their character and nature, a reasonable person under like circumstances would treat as confidential, including, without limitation, the Disclosing Party's personal data, financial information, marketing information, trade secrets, know-how, proprietary tools, proprietary knowledge and proprietary methodologies. Confidential Information of Quest further includes this Agreement, the Products (in source code and/or object code form), the pricing and discounting offered by Quest to Customer hereunder, information regarding the functionality and

performance of the Products, benchmark test results regarding the Products, and any Software license keys provided to Customer. Additionally, Confidential Information shall include "Individually Identifiable Health Information" (as that term is defined in 45 CFR § 164.501) or "Nonpublic Personal Information" (as that term is defined in Title V of the Gramm-Leach-Bliley Act of 1999) that Quest may come into contact with under this Agreement. Confidential Information shall not include information or materials that (a) were, on the Agreement Date, generally known to the public; (b) become generally known to the public after the Agreement Date other than as a result of the act or omission of the Receiving Party; (c) were known to the Receiving Party without an obligation of confidentiality prior to that party receiving the same from the Disclosing Party; (d) the Receiving Party lawfully received from a third party without that third party's breach of agreement or obligation of trust; or (e) are or were independently developed by the Receiving Party without access to or use of the Disclosing Party's Confidential Information. Additionally, it shall not be a breach of this Section for the Receiving Party to disclose the Disclosing Party's Confidential Information as may be required by operation of law or legal process, provided that the Receiving Party provides prior notice of such disclosure to the Disclosing Party unless expressly prohibited from doing so by a court, arbitration panel or other legal authority of competent jurisdiction. The Receiving Party shall not (1) make the Disclosing Party's Confidential Information available to any Affiliates, directors, officers, employees, consultants or representatives (collectively, the **"Representatives"**) who do not have a "need to know" in order to carry out the purposes of this Agreement; (2) otherwise disclose the Disclosing Party's Confidential Information to any third party without the written consent of the Disclosing Party; or (3) use the Disclosing Party's Confidential Information for any purpose other than as contemplated by this Agreement. The Receiving Party shall inform its Representatives of the confidential nature of the Disclosing Party's Confidential Information and the requirements regarding restrictions on disclosure and use as set forth in this Section and shall disclose the Disclosing Party's Confidential Information only to its Representatives who are legally bound to protect the Confidential Information under terms at least as restrictive as those provided herein. The Receiving Party agrees to protect the Disclosing Party's Confidential Information from unauthorized use or disclosure by exercising at least the same degree of care it uses to protect its own similar information, but in no event less than a reasonable degree of care. The Receiving Party shall be liable to the Disclosing Party for any disclosure or other breach in violation of this Agreement by any of its Representatives. The Receiving Party shall promptly notify the Disclosing Party of any known unauthorized use or disclosure of the Disclosing Party's Confidential Information and will cooperate with the Disclosing Party in any litigation brought by the Disclosing Party against third parties to protect its proprietary rights.

**16. Compliance Verification.** At Quest's request, but not more frequently than once per year, Customer shall provide a written report to Quest, signed by an authorized representative, listing Customer's then current deployment of the Products (the **"Report"**). The Report shall contain data sufficient to verify Customer's deployment of the Products within the quantities, Product Terms, and maintenance releases to which it is entitled. Customer will permit Quest to review Customer's deployment of the Products for compliance with the terms and conditions of this Agreement. Any such reviews shall be scheduled at least fifteen (15) days in advance, shall be conducted during normal business hours at Customer's facilities, and shall not unreasonably interfere with Customer's business activities. If Customer's deployment of the Products is found to be greater than contracted for Customer will be invoiced for the additional deployment and the unpaid fees shall be payable in accordance with this Agreement. Additionally, if the unpaid fees exceed five percent (5%) of the fees paid for the subject Products, then Customer shall also pay Quest's reasonable costs of conducting the audit. This Section shall not limit or restrict any other rights or remedies of Quest that are otherwise set forth in this Agreement or available at law.

**17. General.**

(a) **Governing Law and Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any conflict of laws principles that would require the application of laws of a different state. The parties agree that neither the United Nations Convention on Contracts for the International Sale of Goods, nor the Uniform Computer Information Transaction Act (UCITA) shall apply to this Agreement, regardless of the states in which the parties do business or are incorporated. (b)**Assignment.** Except as otherwise set forth herein, Customer shall not, in whole or part, assign or transfer any part of this Agreement, Licenses granted under this Agreement, or any other rights provided hereunder without the prior written consent of Quest. Any attempted transfer or assignment by Customer that is not permitted by this Agreement shall be null and void.

(c) **Severability.** If any provision of this Agreement shall be held by a court of competent jurisdiction to be contrary to law, such provision will be enforced to the maximum extent permissible and the remaining provisions of this Agreement will remain in full force and effect. Notwithstanding the foregoing, the terms of this Agreement that limit, disclaim, or exclude warranties, remedies or damages are intended by the parties to be independent and remain in effect despite the failure or unenforceability of an agreed remedy. The parties have relied on the limitations and exclusions set forth in this Agreement in determining whether to enter into it.

(d) **Use by U.S. Government.** The Software is a "commercial item" under FAR 12.201. Consistent with FAR section 12.212 and DFARS section 227.7202, any use, modification, reproduction, release, performance, display, disclosure or distribution of the Software or Documentation by the U.S. government shall be governed solely by the terms of this Agreement and shall be prohibited except to the extent expressly permitted herein. In addition, when Customer is a U.S. government entity, the language in Subsection 12 (ii) of this Agreement and Section 16 (i) of this Agreement shall not be applicable.

(e) **Personal Data.** Customer hereby acknowledges and agrees that Quest's performance of this Agreement may require Quest to process or store personal data of Customer, its employees and Affiliates and to transmit such data internally within Quest or to Quest Affiliates. Such processing, storage, and transmission (i) shall be for the sole purpose of, and only to the extent necessary for Quest to perform its obligations under this Agreement and (ii) may take place in any of the countries in which Quest and its

---

REV 7.26.11 - DY                    CONFIDENTIAL                    Page 6 of 8

**M S**

Quest Legal Dept.
Approved

Affiliates conduct business, including  countries outside of the European Economic Area.  Quest hereby affirms to Customer that Quest Software, Inc. currently abides by the safe harbor framework as set forth by the U.S. Department of Commerce regarding the collection, use and retention of data from the European Union.

(f)   **Notices.** All notices provided hereunder shall be in writing and addressed to the legal department of the respective party or to such other address as may be specified in an Order or in writing by either of the parties to the other in accordance with this Section. Notices may be, delivered personally, sent by facsimile or e-mail, or mailed by first class mail, postage prepaid.  All notices, requests, demands or communications shall be deemed effective upon personal delivery or four (4) days following deposit in the mail in accordance with this paragraph.

(g)   **Intentionally omitted.**

(h)   **Waiver.** Performance of any obligation required by a party hereunder may be waived only by a written waiver signed by an authorized representative of the other party, which waiver shall be effective only with respect to the specific obligation described therein. Any waiver or failure to enforce any provision of this Agreement on one occasion will not be deemed a waiver of any other provision or of such provision on any other occasion.

(i)   **Injunctive Relief.** Each party acknowledges and agrees that in the event of a material breach of this Agreement, including but not limited to a breach of the "*Software License,*" "*Restrictions*" or "*Nondisclosure*" Sections of this Agreement, the non-breaching party shall be entitled to seek immediate injunctive relief, without limiting its other rights and remedies.

(j)   **Counterparts.** This Agreement and the applicable Schedule(s) may be executed in one or more counterparts, each of which shall be deemed an original and shall constitute one and the same instrument. Signatures exchanged via facsimile will be deemed originals.

(k)   **Force Majeure.** Each party will be excused from performance for any period during which, and to the extent that, it is prevented from performing any obligation or service as a result of causes beyond its reasonable control, and without its fault or negligence, including without limitation, acts of God, strikes, lockouts, riots, acts of war, epidemics, communication line failures, and power failures. Nothing in the foregoing shall be deemed to relieve Customer or its Affiliates of its obligation to pay fees owed under this Agreement.

(l)   **Equal Opportunity.** Quest Software Inc. is a federal contractor and Affirmative Action employer (M/F/D/V) as required by the Equal Opportunity clause C.F.R. § 60-741.5(a).

(m)  **Headings.** Headings in this Agreement are for convenience only and do not affect the meaning or interpretation of this Agreement. This Agreement will not be construed either in favor of or against one party or the other, but rather in accordance with its fair meaning. When the term "including" is used in this Agreement it will be construed in each case to mean "including, but not limited to."

(n)   **Legal Fees.**  If any legal action is brought to enforce any rights or obligations under this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees, court costs and other collection expenses, in addition to any other relief it may be awarded.

(o)   **Entire Agreement.** This Agreement constitutes the entire agreement between the parties regarding the subject matter thereof and supersedes all prior or contemporaneous agreements or representations, written or oral, concerning the subject matter of this Agreement.  Additionally, this Agreement supersedes the terms appearing in websites provided by Customer and used by Quest to facilitate Customer's purchase of or payment for Products and the terms of any Quest shrinkwrap or "click-through" agreement provided with the Products.  In the event of a conflict between the terms of this Agreement and the terms contained in a Schedule signed by Quest, the terms in the Schedule shall control. If necessary, Quest and Customers Affiliates shall negotiate in good faith to enter into a local agreement that reflects local laws, terms and conditions and references this Agreement. In the event of a conflict between the terms in this Agreement and the terms in any local agreement, the terms in the local agreement shall take precedence. Neither this Agreement, nor an Order, may be modified or amended except by a writing executed by a duly authorized representative of each party.  No other act, document, usage or custom shall be deemed to amend or modify this Agreement or an Order.   Delivery of Products shall be FOB Shipping Point.

IN WITNESS WHEREOF, Quest and the Customer have caused this Agreement to be executed and delivered by their respective duly authorized representatives.

*Signature Page to Follow*

**M S**

Qst Legal Dept
Approved

Exhibit B - Nike Answer/Counterclaims
Page 7 of 8

**Quest Software, Inc.**

By: _____

Name: _____ Jennifer Franks _____

Title: ___ Director of Worldwide Licensing Operations ___
_____ Legal Department _____

Date: _____ 4/10/12 _____

**Customer:  World Fuel Services Corporation**

By: _____

Name: _____ Massoud Sedigh _____

Title: ____ Chief Information Officer ____

Date: ____ 04 / 11 / 12 ____

M S

# Exhibit C



**Quest Software Inc.**
4 Polaris Way
Aliso Viejo, CA 92655
tel +1 949 754 8000
fax + 1 949 754 8999

Nike Inc.
Jim Scholefield
Chief Information Officer
1 Bowerman Drive
Beaverton, OR 97005

January 4, 2017

**Ref: Quest Software Inc. (formerly Dell Software Group) License Compliance Notification**

Dear Mr. Scholefield:

As part of Quest Software Inc. ("Quest") ongoing License Compliance management activities, we hereby inform you of our intention to conduct a License Compliance review of Nike Inc. ("Nike") and its subsidiary and affiliate companies. The review will focus on the deployment of Quest products in your organization, in accordance with your Software Transaction Agreement.

This review will be performed with the assistance of Deloitte & Touche LLP ("Deloitte") who has been engaged by Quest to act as an independent third party in verifying the software deployment & entitlement at Nike. The primary contact from Deloitte supporting your audit is Travis Markowitz. Travis will contact your office to schedule an introductory meeting between all parties.

During this meeting, we will explain the proposed scope of the review, next steps, and the estimated timeline for completion. Quest has directed Deloitte to complete all efforts relating to data collection and delivery of the audit report to your organization within 60 days.

It is important that your organization does not remove any installations or change any access to Quest products from the date of this notification letter up to completion of the License Compliance review. This review activity should not in any way inhibit sales negotiations between Quest and Nike that are in progress for license acquisition or support renewal. Any such transactions will be captured and accounted for as part of the license review.

We at Quest would like to thank you for your business. We value our partnership and believe that our joint attention to software compliance will strengthen our relationship going forward.

Thank you for your support.

Sincerely,

Aaron McGowan
Field Programs Manager – License Compliance
Aaron.McGowan@Quest.com
+1.949.754.8942

CC: Doug Fitch (Quest)
CC: Travis Markowitz (Deloitte)

Exhibit C - Nike Answer/Counterclaims
Page 1 of 1

# Exhibit D

KeyCite Yellow Flag - Negative Treatment
Distinguished by Energy Intelligence Group, Inc. v. Tudor, Pickering, Holt & Co. Securities, Inc., S.D.Tex., January 28, 2013

2011 WL 4500922
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

QUEST SOFTWARE, INC., Plaintiff,
v.
DIRECTV OPERATIONS, LLC, Defendant.

No. SACV 09–1232 AG (ANx).
|
Sept. 26, 2011.

**Attorneys and Law Firms**

William Charles Bollard, William Donald Chapman, Julander Brown & Bollard, Irvine, CA, for Plaintiff.

Joseph E. Thomas, Michael I. Katz, Melissa M. Yoon, Thomas Whitelaw and Tyler LLP, Irvine, CA, Jeffrey Vincent Commisso, Thomas Whitelaw and Tyler LLP, San Francisco, CA, for Defendant.


### ORDER RE DEFENDANT'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT


ANDREW J. GUILFORD, District Judge.

**\*1** Plaintiff Quest Software, Inc. ("Plaintiff") licensed its Foglight computer software to Defendant DirecTV Operations, LLC ("Defendant") in 2002. Plaintiff sued Defendant in 2009 for deploying this software in alleged violation Plaintiff's copyrights and the parties' license agreements. Defendant now files two Motions for Partial Summary Judgment (the "Motions"), the first on Plaintiff's claims for copyright infringement and breach of contract, and the second on damages. After considering all arguments and papers submitted, the Courts GRANTS in part and DENIES in part Defendant's Motion for Partial Summary Judgment on Plaintiff's claims for copyright infringement and breach of contract ("First Motion"). The Court GRANTS in full Defendant's Motion for Partial Summary Judgment on damages ("Second Motion").


*BACKGROUND*

Defendant provides satellite television to nearly 20 million customers in the United States. (First Motion at 2:17–18.) Plaintiff creates and licenses computer systems management software, including a line of software named Foglight. (Complaint ("Compl.") ¶ 5.) Foglight allows users to detect, diagnose, and fix certain problems in computer systems. (*Id.* ¶ 7.) Defendant used Foglight primarily to monitor the performance of computer servers supporting its customer service call centers. (First Motion at 2:15–18.) Foglight software has nothing to do with Defendant's satellite television service. (*Id.*)

In 2002, the parties signed a software license agreement ("License Agreement") allowing Defendant to use certain Foglight software. (*Id.* ¶¶ 10–12.) The License Agreement consisted of two parts—a standard form software license agreement and a customized addendum ("Addendum") modifying many of the standard terms (Defendant's Statement of Uncontroverted Facts and Law in Support of its Second Motion ("UF2") ¶ 3.) The

License Agreement allowed Defendant to use Foglight on its Windows NT servers only. The License Agreement also limited Defendant's use of Foglight to a certain number of central processing units ("CPUs"). (Defendant's Statement of Uncontroverted Facts and Law in Support of its First Motion ("UF 1") ¶ 4.)

Plaintiff alleges that Defendant "overdeployed" Foglight by using it on more CPUs than the License Agreement permitted. (UF 1 ¶¶ 48–49.) Under the terms of the License Agreement, overdeployment does not constitute an automatic breach. In fact, the License Agreement permits Defendant to overdeploy Foglight provided that Defendant later pays Plaintiff for using the software on additional CPUs. This payment is referred to as the "true-up" payment. (*Id.*)

Sometime in 2005, Defendant decided to shift its call center CPUs from Windows NT servers to AIX servers. (UF1 ¶ 8.) Hewlett Packard ("HP"), Defendant's server administrator, told Plaintiff that the migration to AIX servers would begin in June 2006 and end in June 2007. (UF1 ¶ 9.) The parties dispute whether, and to what extent, Plaintiff knew and approved of Defendant's use of Foglight on the new AIX servers. Indeed, Defendant's Motions turn primarily on (1) whether Plaintiff knew and approved of Defendant's use of Foglight on AIX servers, and (2) whether Plaintiff knew how many of Defendant's servers were running Foglight. In any event, Plaintiff continued to provide support services to Defendant after Foglight was installed on its AIX servers. (UF 1 ¶¶ 17–23.)

**\*2** In June 2007, Plaintiff requested information from Defendant concerning its computer systems. At Defendant's direction, HP created data reports (the "June 2007 Reports") and sent them to Plaintiff. The June 2007 Reports purported to show the number and type of servers running Foglight software. (UF1 ¶¶ 32–33.) Although the parties dispute the accuracy of the June 2007 Reports, there is no dispute Plaintiff could not have been ignorant of Defendant's overdeployment after receiving them. (Plaintiff's Opposition to Defendant's First Motion ("Opp'n") at 4:7–8.)

In late 2008, Plaintiff sent Defendant an invoice that included (1) true-up fees for the overdeployed licenses; (2) "retroactive" maintenance fees for the overdeployed licenses; and (3) maintenance fees for 2009. (Second Motion at 3:21:25.) Defendant refused to pay the invoice and Plaintiff filed suit.

Based on these facts and others, Plaintiff asserts claims against Defendant for copyright infringement and breach of contract. Defendant now files two Motions for Partial Summary Judgment—one on Plaintiff's claims for copyright infringement and breach of contract and the other concerning damages.

### *PRELIMINARY MATTERS*

The parties submitted numerous evidentiary objections. In motions with numerous objections, "it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised." *Doe v. Starbucks, Inc.,* No. 08–0582, 2009 WL 5183773, at \*1 (C.D.Cal. Dec.18, 2009).

The Court has reviewed the parties' objections and relies only on admissible evidence. *See F.T.C. v. Neovi, Inc.,* 598 F.Supp.2d 1104, 1118 n. 5 (S.D.Cal.2008) ("The parties have each filed evidentiary objections. However, in deciding the present motions, the Court has only relied upon admissible evidence."); *See also Schroeder v. San Diego Unified School Dist.,* Case No. 07–266, 2009 WL 1357414, at \*2, n. 1 (S.D.Cal. May 13, 2009).

### *LEGAL STANDARD*

Summary judgment is appropriate only where the record, read in the light most favorable to the non-moving party, indicates that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those necessary to the proof or defense of a claim, as determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. If, and only if, the moving party meets its burden, then the nonmoving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. *Id.* at 322–23. If the nonmoving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.,* 210 F.3d 1099, 1103 (9th Cir.2000).

### *ANALYSIS*
**\*3** The Court first considers Defendant's Motion for Partial Summary Judgment on Plaintiff's claims for copyright infringement and breach of contract. The Court then considers Defendant's Motion for Partial Summary Judgment on maintenance fees damages.

### 1. PLAINTIFF'S FIRST CLAIM, FOR COPYRIGHT INFRINGEMENT
Plaintiff alleges that Defendant infringed its registered Foglight copyrights, in violation of the Copyright Act, 17 U.S.C. Section 101 *et seq.* (Compl.¶ 28.) Plaintiff bases this claim on two theories: (1) that Defendant improperly used Foglight software on CPUs with AIX servers, and (2) that Defendant used Foglight on more CPUs than the License Agreement permitted (*Id.* ¶¶ 16, 20, 27.) Plaintiff also claims that Defendant infringed its copyrights by altering the Foglight software. (Opposition to Defendant's First Motion ("Opp'n") at 9:8–10:27.) The Court considers these arguments in turn.

#### 1.1 Use of Foglight Software on AIX Servers
In its Complaint, Plaintiff alleges that Defendant violated its Foglight copyrights by copying Foglight onto AIX servers without Plaintiff's authorization. (Compl.¶ 31.) Defendant argues that using Foglight on its AIX servers did not violate Plaintiff's copyrights because Plaintiff impliedly licensed Defendant to do so. (UF 1 ¶ 15.) The Court agrees with Defendant.

"The existence of a license creates an affirmative defense to a claim of copyright infringement." *Worldwide Church of God v. Philadelphia Church of God, Inc.,* 227 F.3d 1110, 1114 (9th Cir.2000). A nonexclusive license, like the one in this case, may be granted expressly or impliedly through conduct. *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558 (9th Cir.1990). An implied license may be found where conduct by the copyright holder leads another party to believe that they may use the copyright. *See Field v. Google, Inc.,* 412 F.Supp.2d 1106, 1116 (D.Nev.2006) (citing *De Forest Radio Tel. & Tel. Co. v. United States,* 273 U.S. 236, 47 S.Ct. 366, 71 L.Ed. 625 (1927)).

An implied license to use copyrighted software exists when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute [the] work" or "use, retain and modify the programs." *Asset Marketing Systems, Inc. v. Gagnon,* 542 F.3d 748, 754–55 (9th Cir.2008) (footnote and internal quotation marks omitted).

Here, the first requirement is satisfied because Defendant paid Plaintiff to adapt Foglight to AIX servers supporting Defendant's call centers. (UF1 ¶¶ 17–20, 24–26, 37.) The second requirement is also met because Plaintiff delivered Foglight to Defendant and uploaded it to the AIX servers. (*Id.* ¶ 23.) And the third requirement is satisfied because Plaintiff permitted Defendant to use Foglight on AIX servers. The March 2007 Statement of Work signed by the parties provided that Defendant would "[d]eploy Foglight ... on as many AIX servers as possible ..." (*Id.* ¶ 25.) The efforts of Plaintiff's consultants to load Foglight on the AIX servers further demonstrate that Plaintiff not only knew of Defendant's use Foglight on the AIX servers, but intended

Defendant to use Foglight in this manner. (*Id.* ¶ 26.)

### 1.2 Overdeployment of Foglight Software

**\*4** Plaintiff also argues that Defendant violated its Foglight copyrights by running Foglight software on more CPUs than the License Agreement allowed. This argument fails because it states a claim for contract breach, not for copyright infringement.

"Generally, a copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement and can sue only for breach of contract." *Sun Microsystems v. Microsoft Corp.,* 188 F.3d 1115, 1121 (9th Cir.1999) (internal quotation marks omitted). A licensee may sue for copyright infringement only when the licensee acts outside the scope of the license. *Id.* (citing *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d at 1081, 1087 (9th Cir.1989).

To prove that a licensee acted outside the scope of a license, the licensor "must demonstrate that the violated term ... is a condition rather than a covenant" under state contract law and federal copyright law. *MDY Indus., LLC v. Blizzard Entm't, Inc.,* 2011 U.S.App. LEXIS 3428, at \*15, 2011 WL 538748 (9th Cir. Feb 14.2011). Stated somewhat circularly, conditions are "contractual terms that limit a license's scope ... the breach of which constitute[s] copyright infringement." *Id.* at \*16. All other license terms are "covenants," which the Ninth Circuit has defined to mean a "contractual promise, i.e., a manifestation or intention to act or refrain from acting in a particular way." *Id.* (citing Restatement (Second) of Contracts § 2 (1981)).

Here, the overdeployment and true-up provisions in the License Agreement permit Defendant to use Foglight on additional CPUs for an extra fee. These provisions are properly described as covenants because they do not concern the scope of the license, only the number of CPUs the license covers. *See, e.g., BroadVision, Inc. v. Medical Protective Co.,* 2010 U.S. Dist. LEXIS 131106, 2010 WL 5158129 (S.D.N.Y. Nov. 23, 2010) (applying California law to find that the license provisions permitting excess use of software in exchange for higher fees are covenants, not conditions.) Because the provision restricting the number of CPUs on which Foglight can run is a covenant, its breach provides Plaintiff no grounds to claim that Defendant infringed its copyright.

### 1.3 Alteration of Foglight Software

In its Opposition, Plaintiff argues for the first time that Defendant infringed its Foglight copyrights by altering the Foglight software. (Opp'n at 9:11–27.) Plaintiff contends that its copyright claims must survive Defendant's First Motion because "questions remain as to whether DirecTV itself made changes to the Foglight software beyond those authorized and performed by Quest ...." (UF1 ¶¶ 20, 54, 55.) Plaintiff also states that questions of fact exist as to whether the customization work performed by HP, Defendant's agent, constituted copyright infringement. (Opp'n to First Motion at 9:27–10:1.)

Plaintiff's argument fails because it is factually unsupported and procedurally improper. To support its contention that Defendant impermissibly altered the Foglight software, Plaintiff cites several lines of deposition testimony from Defendant's employee who used to work for HP and three paragraphs from Defendant's Statement of Uncontroverted Facts and Law. (*Id.* at 9:25–27.) First, Defendant's employee's testimony does nothing to establish that Defendant or HP altered the Foglight software. (Declaration of William J. Kolegraff in Support of Defendant's Reply to Plaintiff's Opp'n at Ex A.; UF1 ¶¶ 20, 54, 55.) It only suggests that HP was *capable* of making such changes. (*Id.*)

**\*5** Likewise, Plaintiff's references to Defendant's uncontroverted facts prove nothing. Those facts establish that Plaintiff's consultant "traveled to HP's facilities multiple times ... to install and customize the Foglight software on DIRECTV's AIX servers ..." (UF1 ¶ 20.) But this demonstrates that Plaintiff's agent, not Defendant, modified the Foglight software. Other undisputed facts indicate that Plaintiff helped Defendant install, troubleshoot, and customize Foglight. (*Id.* ¶¶ 54, 55.) They provide no support for Plaintiff's claim that

Defendant made impermissible modifications to its software.

Plaintiff's argument also fails because it is procedurally improper. Plaintiff did not plead this theory of liability in its Complaint. Nor did Plaintiff raise this argument in its Rule 26(f) disclosure or at anytime during discovery. *See Coleman v. Quaker Oats Co.,* 232 F.3d 1271 (9th Cir.2000) ( "[A]dding a new theory of liability at the summary judgment stage would prejudice the defendant who faces different burdens and defenses under a second theory of liability." (citations omitted)). The Court will not permit Plaintiff to raise this theory of liability for the first time in its Opposition to Defendant's First Motion.

### 1.4 Conclusion

There is no genuine issue of material fact concerning Plaintiff's claim for copyright infringement. Thus, the Court GRANTS Defendant's First Motion on Plaintiff's first claim.

## 2. PLAINTIFF'S SECOND CLAIM, FOR BREACH OF CONTRACT

Plaintiff alleges that Defendant breached the License Agreements by (1) overdeploying its licenses of Foglight software and (2) using Foglight on the AIX servers. (Comp.¶ 41.) Defendant does not move for summary judgment on the basis that it never overdeployed Foglight software. In its First Motion, Defendant instead argues that equitable estoppel bars Plaintiff from asserting that Defendant breached the License Agreement. Before turning to the parties' specific claims, the Court first examines the doctrine of equitable estoppel.

### 2.1 Equitable Estoppel

Four elements are necessary to establish equitable estoppel:

> (1) the party to be estopped must know the facts (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*U.S. v. King Features Entertainment, Inc.,* 843 F.2d 394, 399 (9th Cir.1988) (citing *Bob's Big Boy Family Restaurants v. N.L.R.B.,* 625 F.2d 850, 854 (9th Cir.1980)). In other words, a plaintiff will be estopped from asserting a breach of contract claim if he aids or induces a breach. *See Field v. Google,* 412 F.Supp.2d 1106 (D.Nev.2006).

Here, for its equitable estoppel defense to succeed, Defendant must prove the following: (1) that Plaintiff knew Defendant was using Foglight software on AIX servers or overdeploying Foglight; (2) that Plaintiff's actions or omissions led Defendant to believe that Plaintiff did not intend to enforce its rights under the License Agreement; (3) that Defendant was unaware that Plaintiff objected to its use of Foglight software on AIX servers or its overdeployment of Foglight; and (4) that Defendant detrimentally relied on Plaintiff's actions or omissions.

**\*6** The parties' arguments concerning equitable estoppel resemble two ships passing in the night. Defendant forcefully argues that equitable estoppel bars Plaintiff from claiming that Defendant breached the License Agreement by *using Foglight on the AIX servers,* but says little about overdeployment. Plaintiff, on the other hand, largely ignores the AIX servers. Instead, Plaintiff focuses on arguing that equitable estoppel does not bar its claim that Defendant breached the License Agreement by *overdeploying Foglight software.*

The Court now will now bring these ships to safe harbor.

Quest Software, Inc. v. DirecTV Operations, LLC, Not Reported in F.Supp.2d (2011)

**2.2 Using Foglight on the AIX Servers**
To support its equitable estoppel defense, Defendant claims that Quest "helped [it] install Foglight on the AIX servers" and "led [it] to believe it did not object to that use, or require any payment for such use." (First Motion at 13:15–19.) Defendant also claims that it relied, to its detriment, on Plaintiff's actions when deciding to install Foglight on the AIX servers. *Id.* Thus, Defendant concludes that equitable estoppel bars Plaintiff breach of contract claim as to Defendant's use of Foglight on AIX servers. The Court agrees.

**2.2.1 Whether Plaintiff Knew of Defendant's Use of Foglight Software on AIX Servers**
To satisfy the first element of the equitable estoppel test, Defendant must prove that Plaintiff knew Defendant was using Foglight software on AIX servers. The facts demonstrate that Plaintiff helped Defendant "install and customize Foglight on AIX servers." (UF 1 ¶ 54.) Plaintiff does not dispute that it was aware that Defendant used Foglight on AIX servers. Accordingly, the Court finds this element to be satisfied.

**2.2.2 Whether Plaintiff's Actions or Omissions Demonstrated That it Did Not Intend to Enforce its Contract Rights**
To satisfy the second element, Defendant must prove that Plaintiff led it to believe that Plaintiff would not enforce its contract rights to prevent Defendant from using Foglight on the AIX servers. Defendant claims that "Quest's actions and lack of objection led DIRECTV reasonably to believe it had permission to use Foglight on the AIX servers ...." (First Motion at 15:21–23.) As noted, Plaintiff helped Defendant customize Foglight for AIX servers. Plaintiff also sent consultants to teach Defendant how to operate Foglight software on AIX servers, without ever telling Defendant that it was unlicensed to use Foglight software on AIX servers or demanding license fees for such use. (*Id.* at 15:27–28.)

Plaintiff fails to present adequate proof that its actions did not lead Defendant to believe that it had permission to run Foglight on AIX servers. The Court finds this element to be satisfied.

**2.2.3. Whether Defendant was Ignorant of Plaintiff's Objections**
To satisfy the third element, Defendant must prove that it was unaware that Plaintiff objected to its use of Foglight on AIX servers. Defendant claims that it was unaware of Plaintiff's objection for the same reasons identified in Section 2.2.2. For example, Defendant claims that Plaintiff's actions—"teaching DIRECTV how to install Foglight on the machines" and "working with DIRECTV to overcome problems"—led Defendant to believe that Plaintiff had no objection to its use of Foglight on AIX servers. (First Motion at 16:20–23.)

**\*7** As before, Plaintiff provides insufficient evidence to support a claim that Defendant was aware that it objected to Defendant's use of Foglight software on AIX servers. The Court finds this element to be satisfied.

**2.2.4. Whether Defendant Relied to Its Detriment**
To satisfy the fourth element, Defendant must prove that it relied to its detriment on Plaintiff's silence. Defendant claims that it would not have used Foglight on AIX servers if it had known that Plaintiff would claim fees. (Motion at 17:14–16.) The Court finds, and Plaintiff does not effectively dispute, that Defendant has satisfied this element.

**2.2.5. Conclusion**
The Court has reviewed Plaintiff's other arguments, and finds them unpersuasive. Defendant has demonstrated that equitable estoppel bars Plaintiff's breach of contract claim as to Defendant's use of Foglight software on

AIX servers. Thus, the Court GRANTS Defendant's Motion for Partial Summary Judgment on Plaintiff's breach of contract claims for the unauthorized use of Foglight on AIX servers.

### 2.3 Overdeploying Foglight Software

As noted, Defendant dedicates most of his First Motion to arguments concerning AIX servers, and gives much less attention to the issue of overdeployment. Because Defendant does not come close to satisfying all four equitable estoppel factors on this issue, Plaintiff's breach of contract claim based on Defendant's alleged overdeployment survives summary judgment.

### 2.3.1 Whether Plaintiff Knew of Defendant's Overdeployment of Foglight

Plaintiff argues that it was not aware of Defendant's overdeployment of Foglight until June 2007, when HP provided results of an audit of Defendant's computer systems to Plaintiff. (Opp'n to First Motion at 3:21–4:7.) Defendant disputes this fact, arguing that Plaintiff knew Defendant was overdeployed before June 2007. (UF 1 ¶ 58.)

Defendant presents insufficient evidence to support its claim that Plaintiff was aware of the overdeployment before June 2007. Defendant claims that in March 2007, Plaintiff created a Statement of Work instructing its agents to "[d]eploy Foglight [software] ... on as many AIX servers as possible within the allocated amount of time." (Motion at 15:12–13.) But Defendant does not explain how this statement proves that Plaintiff knew about the overdeployment. Indeed, this statement means only what it says—that Plaintiff intended to deploy Foglight software on as many AIX servers as possible in a limited period of time. It doesn't imply, much less prove, that Defendant intended to install Foglight software on more CPUs than the License Agreement permitted.

Defendant also claims that Plaintiff had "estimates" of Defendant's pre-June 2007 deployment of Foglight. (Reply at 10:14–15.) Defendant claims, for example, that in April 2006, it informed Plaintiff of its plans to use Foglight on 192 AIX servers. (*Id.* at 10:16.) This argument is flawed. First, mere estimates do not provide a sufficient basis to establish that Plaintiff's *knew* Defendant was overdelployed. Second, Defendant does not provide evidence demonstrating that 192 servers constitutes an overdeployment.

**\*8** Defendant further claims that in July 2006 one of Plaintiff's employees attempted to bill Defendant to deploy Foglight on 550 AIX servers. Even if true, this does not come close to proving that no genuine issue of material fact exists concerning overdeployment.

Because Defendant has not proven that Plaintiff was aware of any overdeployment, at least before June 2007, its equitable estoppel defense fails on this point. When Plaintiff became aware of Defendant's purported overdeployment is a genuine issue of material fact. Accordingly, the Court DENIES Defendant's Motion for Partial Summary Judgment on Plaintiff's claim for breach of contract for overdeployment of Foglight software.

### 2.3.2 Whether Plaintiff's Actions or Omissions Demonstrated That It Did Not Intend to Enforce Its Contract Rights

Even if Defendant could prove that Plaintiff knew of the overdeployment, its equitable estoppel defense would fail because an issue of fact exists concerning whether Plaintiff intended to enforce its contract rights. Defendant claims that Plaintiff did not intend to charge Plaintiff for any overdeployment, but the terms of the License Agreement indicate otherwise.

The License Agreement specifically addresses the issue of payment in cases of overdeployment. Under the terms of the License Agreement, Defendant had the "right to increase the aggregate number of CPU's ... by up to 10% per product ... at no additional fee." (First Motion at 4:1–9.) Defendant could exceed this 10% threshold

on the condition that it paid Plaintiff additional license fees. (*Id.*)

Plaintiff argues that the existence of this true-up provision is one of the reasons why it did not immediately seek overdeployment fees from Defendant. Whatever the merits of this claim, it raises an issue of fact that the Court cannot decide on summary judgment.

**2.3.3 Conclusion**
The Court has considered Defendant's other arguments, and finds them unpersuasive. Because genuine issues of fact exist concerning Plaintiff's knowledge of Defendant's overdeployment and Plaintiff's willingness to enforce its contract rights, the Court need not consider factors three and four of the equitable estoppel test. Equitable estoppel does not bar Plaintiff from claiming that Defendant's purported overdeployment constituted a breach of the License Agreement. Accordingly, the Court DENIES Defendant's Motion for Partial Summary Judgment on Plaintiff's claim for breach of contract based on overdeployment.

**3. PLAINTIFF'S CLAIM FOR MAINTENANCE SERVICE FEE DAMAGES**
Plaintiff alleges that Defendant breached the License Agreement by failing to pay maintenance service fees. (Compl.¶¶ 24–26, 42.) Defendant argues that the License Agreement doesn't require it to pay the maintenance fees Plaintiff seeks to recover. The Court first considers Plaintiff's claim for maintenance fee damages for 2009. It then turns to Plaintiff's claim for "retroactive" maintenance fees. Finally, the Court discusses the quasi-contract argument Plaintiff raises for the first time in its Opposition to Defendant's Second Motion.

**3.1 Plaintiff's Claim for Maintenance Fee Damages For 2009**
**\*9** Plaintiff alleges that Defendant breached the License Agreement by failing to pay software maintenance fees to Plaintiff for first quarter of 2009. (Compl.¶¶ 24–26, 42.) Defendant argues that it was not obligated to pay software maintenance fees in 2009 because it properly canceled the maintenance services agreement. (Second Motion at 5:8–10.) The Court agrees with Defendant.

As noted, the parties entered into two agreements in 2002. First, the parties signed a standard form software license agreement. One week later, the parties negotiated an Addendum, which modified the terms of the standard form. Together, these agreements constitute the License Agreement. Section 10 of the License Agreement governs "Maintenance And Other Services." Under that section, "Maintenance Periods" begin on the date of the first invoice mailed by Plaintiff and end 12 months later. (*Id.*) Section 10 also provides that:

> Each Maintenance Period shall automatically renew for another twelve (12) months unless the renewal has been cancelled by either party's giving written notice at least sixty (60) days prior to that first day of the renewal Maintenance Period. *Licensee's failure to make payment on a maintenance renewal invoice shall constitute Licensee's cancellation of Maintenance Services.*

(*Id.*) (emphasis added).

Although Section 10 is not a model of clarity, its language permits Defendant, as licensee, to cancel maintenance services simply by failing to make payment on a maintenance renewal invoice. In December 2008, Plaintiff sent an invoice requesting renewal of maintenance services for 2009. (Second Motion, Ex. F.) By not paying the bill, Defendant effectively canceled maintenance services. (UF2 ¶ 8.)

Plaintiff admits that the License Agreement modified by the Addendum permitted Defendant to discontinue maintenance services by not paying the renewal invoice. Plaintiff also admits that Defendant declined to renew the maintenance contract when it expired at the end of 2008. Thus, there is no genuine issue of material fact

**Quest Software, Inc. v. DirecTV Operations, LLC, Not Reported in F.Supp.2d (2011)**

concerning Defendant's contractual obligation to pay maintenance fees in 2009.

### 3.2 Plaintiff's Claim for Retroactive Maintenance Fees

Plaintiff also alleges that Defendant owes "retroactive" maintenance fees on the licenses it overdeployed. (Compl.¶¶ 24–26, 42.) Defendant argues that Plaintiff cannot recover "retroactive" maintenance fees because the true-up provision in the License Agreement never mentions them. (Second Motion at 5:8–10 .) Again, the Court agrees with Defendant.

As noted, overdeployment does not constitute an automatic breach of the License Agreement. In fact, the License Agreement provides specific procedures to follow in cases of overdeployment. Under the terms of the License Agreement, a licensee can remedy overdeployment simply by paying the licensor for the extra licenses. The true-up provision in Paragraph 16 of the License Agreement provides that:

> **\*10** If the Licensee's use of the Software is found to be greater than contracted for, Licensee will be invoiced for the additional licenses or license upgrades (based on the applicable units of measure, e.g., servers, server tiers, or users) and the license fees shall be payable in accordance with this Agreement.

(Second Motion, Ex. F.) Significantly, the true-up provision does not require payment of maintenance fees in cases of overdeployment.

Still, Plaintiff claims that the true-up provision requires payment of maintenance fees as well. For example, Plaintiff states that "even if the overdeployment itself did not constitute a breach of the agreement, DirecTV's subsequent refusal to provide compensation to Quest for the unauthorized licenses *and associated maintenance benefits* enjoyed by those licenses did constitute a breach ...." (Opp'n to Second Motion at 7:22–28 (emphasis added).) Plaintiff also claims that the true-up mechanism contemplated payment for "unauthorized licenses *and maintenance thereon.*" (*Id.* at 4:21–27 (emphasis added).)

Plaintiff's arguments cannot overcome the plain language of the License Agreement. Defendant is required to pay licenses fees, not maintenance costs, on overdeployed Foglight software. Because the License Agreement does not require Defendant to pay retroactive maintenance fees when overdeployment occurs, Plaintiff's claim for retroactive maintenance fee damages fails as a matter of law.

### 3.3 Quasi–Contract

After arguing the merits of its contract claims for maintenance fee damages, Plaintiff asks the court to consider "quasi-contractual theories of recovery as well." (Opp'n to Second Motion at 9:1–28.) Plaintiff did not allege these theories in its Complaint or raise them during discovery. So Plaintiff asks the Court to treat Defendant's Motion as a Rule 12(c) motion for judgment on the pleadings and permit Plaintiff "to amend its complaint to state a claim for restitution based on quantum meruit." (*Id.*)

The Court need not address the merits of Plaintiff's quantum meruit argument because its request to amend its pleadings, coming nearly two years after filing suit and less than one month before trial, is untimely. In its April 2010 Scheduling Order, the Court gave the parties 90 days to amend their pleadings, explaining that post-deadline amendment would be permitted only under "exceptional circumstances." (Dkt. No. 27.)

Federal Rule of Civil Rule 16(b) requires a showing of "good cause" when a party seeks to amend its pleading after the deadline established in a scheduling order. *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1294 (9th Cir.2000.) If the party seeking the amendment "was not diligent, the inquiry should end." *Id.* Here, Plaintiff has not been sufficiently diligent.

**3.4 Conclusion**

The Court has considered Plaintiff's other arguments, and finds them unpersuasive. Defendant's Motion for Partial Summary Judgment on Plaintiff's claims for damages for unpaid maintenance fees is GRANTED in full.

*DISPOSITION*

**\*11** The Court thoroughly reviewed the parties' papers and issued a Tentative Order. At the hearing on the Tentative Order, additional arguments were presented. But there has not been a Rule 56(d) motion and the Court feels impelled to based its Order on the papers submitted.

Defendant's First Motion for Partial Summary Judgment is GRANTED as to Plaintiff's claim for copyright infringement. Defendant's First Motion for Partial Summary Judgment is GRANTED in part and DENIED in part as to Plaintiff's claim for breach of contract. Equitable estoppel bars Plaintiff from claiming that Defendant breached the License Agreement by using Foglight on the AIX servers. But equitable estoppel does not bar Plaintiff from claiming that Defendant breached the License Agreement by overdeploying the Foglight software. Defendant's Second Motion for Partial Summary Judgment on Plaintiff's claims seeking recovery for maintenance fee damages is GRANTED in full.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4500922

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he caused a copy of the foregoing **DEFENDANT AND COUNTERCLAIMANT NIKE, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DEMAND FOR JURY TRIAL** to be served via CM/ECF electronic notification system on all parties requesting same.

Dated: May 31, 2018                                    Respectfully Submitted,

*s/ B. John Casey*
B. John Casey, OSB No. 120025
john.casey@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone: (503) 224-3380
Facsimile:  (503)  220-2480

Andrew L. Deutsch, CSB No. 319286
andrew.deutsch@dlapiper.com
*Admitted pro hac vice*
DLA PIPER LLP
2000 Avenue of the Stars
Los Angeles, CA  90067
Telephone: (310) 595-3000
Facsimile:  (310)  595-3030

Francis W. Ryan, NYB No.  2684058
frank.ryan@dlapiper.com
*Admitted pro hac vice*
Kerry A. O'Neill, NYB No. 5143995
kerry.oneill@dlapiper.com
*Admitted pro hac vice*
DLA PIPER LLP
1251 Avenue of the Americas
New York, NY  10020
Telephone: (212) 335-4850
Facsimile:  (212) 335-4501

Attorneys for Defendant/Counterclaimant
NIKE, Inc.